## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ALEF JUDAICA, INC., a California corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| MERCHANDISE MART, L.L.C., a Delaware limited liability company, | ) ) ) |
| Defendant. | ) ) |

FILED: JUNE 12, 2008
08CV3408
JUDGE LINDBERG
MAGISTRATE JUDGE BROWN
EDA

Case No. _____

**JURY DEMANDED**

## COMPLAINT

Plaintiff ALEF JUDAICA, INC. ("Plaintiff" or "Alef Judaica") complains of Defendant

MERCHANDISE MART, L.L.C. ("Defendant" or "The Mart") as follows:

## NATURE OF THE CASE

1.      Plaintiff Alef Judaica, The Mart's tenant for nearly twenty years, brings this

action against The Mart for fraudulently inducing it into a new lease and then breaching that new

lease.  The events that give rise to this Complaint began when The Mart approached Alef Judaica

about moving its showroom from its existing location on the 13th floor of the Merchandise Mart

to a space on the 12th floor.  After Alef Judaica initially declined, The Mart then lowered the rent

for the new space, resulting in an offer of more space, in a more attractive location, and for less

money than Alef Judaica was then paying in rent.  Given this extremely attractive offer, Alef

Judaica agreed and the parties entered into a new, three-year lease in April 2007 for a showroom

on the Merchandise Mart's 12th floor.

2.      A few months later, The Mart's reasons for clearing Alef Judaica and others off of

the 13th floor became clear:  The Mart was clearing tenants from the 13th floor to make room for

other, apparently more desirable, tenants that would soon need to move there from the 12th floor.

The Mart showed this by, in July 2007, informing Alef Judaica that The Mart had decided to use the 12th floor for a different purpose, meaning Alef Judaica would have to leave its new showroom and become a temporary tenant. When it lured Alef Judaica into moving out of its 13th floor showroom by suggesting it move to a new location on the 12th floor and agreeing to a three-year lease for that location, The Mart did not tell Alef Judaica about its plans to use the 12th floor for other purposes.

3.     Although, Alef Judaica refused to give up its new showroom, The Mart nevertheless required Alef Judaica to vacate its showroom before the end of, and in breach of, the parties' new three-year lease. As a result of The Mart's breach, Alef Judaica lost its showroom and the sales that showroom generated. Alef Judaica now brings this action to recover the over $200,000 in damages it has and will continue to suffer plus punitive damages, attorneys' fees, and costs resulting from The Mart's breach of contract and fraudulent conduct.

## PARTIES

4.     Plaintiff Alef Judaica, Inc., a Judaica wholesaler that offers a wide selection of Judaica, Jewish gifts, Jewish books, Jewish ritual items and related items, is a California corporation with its principal place of business at 13310 South Figueroa Street in Los Angeles, California.

5.     Defendant Merchandise Mart, L.L.C. ("The Mart") is a Delaware limited liability company with offices in the Merchandise Mart. The Merchandise Mart, located at 222 Merchandise Mart Plaza in Chicago, Illinois, houses the world's largest wholesale design center and attracts more than three million visitors a year. The Mart acts as the landlord for retailers, like Alef Judaica, looking to lease space in the Merchandise Mart.

6.     The Mart's sole member is Vornado Realty LP, a Delaware limited partnership. Vornado Realty LP's sole member, in turn, is the Vornado Realty Trust, a publicly traded

Maryland real estate investment trust. Vornado Realty Trust's trustees are Steven Roth, Candace K. Beinecke, Anthony W. Deering, Michael D. Fascitelli, Robert P. Kogod, Michael Lynne, David Mandelbaum, Robert H. Smith, Ronald Targan, Richard R. West, and Russel B. Wight, Jr. On information and belief, none of the Vornado Realty Trust's trustees are citizens of the state of California.

## JURISDICTION AND VENUE

7.      Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a), because (1) Alef Judaica is a citizen of California and neither the Defendant, its member, its member's member, nor, upon information and belief, the trustees of its member's member are citizens of California and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred in the Northern District of Illinois, and because the Defendant's offices are within the Northern District of Illinois.

## BACKGROUND FACTS

9.      Prior to the events giving rise to the claims set forth in this Complaint, Alef Judaica maintained a permanent showroom on the 13th floor of the Merchandise Mart for approximately twenty years.

10.     From this permanent showroom, Alef Judaica displayed its products during shows put together by The Mart. The Mart targeted these shows to potential purchasers of design products like those sold by Alef Judaica. By having a permanent showroom, Alef Judaica had the space necessary to display its entire product line. Having a permanent showroom also allowed Alef Judaica to avoid having to ship samples of that product line back and forth between

Chicago and its main offices in California, thereby avoiding the risks associated with such shipments.

11.     Since 2000, Alef Judaica has averaged nearly $100,000 in annual sales from its showroom at The Mart during two shows, The Chicago Market:  Living and Giving, held in January and July or August of each year ("Winter Show" and "Summer Show" respectively).  On average, since 2000, Alef Judaica had sales of $36,746 during the Winter Show and $61,759 during the Summer Show.

12.     Alef Judaica rented its permanent showroom through a series of lease agreements and amendments.  Prior to the events that gave rise to the claims in this Complaint, Alef Judaica's lease with The Mart for the showroom on the 13th floor was to expire on June 30, 2008.

13.     Though satisfied with its 13th floor showroom, Alef Judaica regularly discussed with The Mart's representatives the idea of moving to other locations within The Merchandise Mart.  Indeed, in the Second Lease Amendment that ran through June 30, 2008, the parties included a provision granting Alef Judaica the option to relocate during the term of that lease.

**A.     The Mart Offers Alef Judaica The Opportunity To Move Off Of The 13th Floor.**

14.     In November 2006, with well over a year and a half remaining on Alef Judaica's existing lease, the Mart's leasing manager, Marion Jarocki, approached Alef Judaica and offered it the opportunity to move its showroom to a space on the 12th floor.  In making this offer, The Mart was not acting pursuant to the relocation provision of the current lease, but rather simply proposing a new lease for the new space.

15.    Acting through Lance Arenson, its President, Alef Judaica initially declined The Mart's offer because it did not want to pay more than it was currently paying, even if the space was larger and in a more attractive location than its current space.

16.    In response, The Mart lowered the rent it sought for the new space so that the rent for that new space would actually be less than what Alef Judaica was already paying for its existing showroom.

17.    At no time during its discussions with Alef Judaica did The Mart inform, or even mention, that it was considering using the 12th floor for other purposes that would or could require Alef Judaica to vacate the new showroom at any time prior to the end of the three-year Lease being proposed by The Mart.

18.    Given that it was now being offered more space for less money, in March 2007, Alef Judaica accepted The Mart's new offer for a new three-year lease for a showroom on the 12th floor.

**B.    The Parties Agree To Enter Into A New Lease For A Showroom On The 12th Floor And Alef Judaica Moves Into Its New Showroom.**

19.    As a result, on April 16, 2007, the parties entered into a new lease drafted by The Mart.  Under its terms, the new lease cancelled the parties' existing lease for Alef Judaica's 13th floor showroom and created a new three-year lease that was to run through May 31, 2010 for a 12th floor showroom.  A copy of that new lease is attached as Exhibit 1 and the new lease is referred to here as "the Lease."

20.    The Lease included as Exhibit B "Certain Rights Reserved By Landlord."  In Section O of Exhibit B to the Lease, The Mart reserved to itself the right to move Alef Judaica to another showroom to "maintain the integrity of the marketplace."  To do so, The Mart had to provide Alef Judaica with at least sixty days written notice and then meet four conditions by:  (1)

providing a new space as big or bigger than Alef Judaica's current space, (2) providing a new space comparable to Alef Judaica's current space, (3) bearing the costs of moving Alef Judaica into the new space, and (4) allowing Alef Judaica to occupy that new space for the remainder of the Lease.

21.     By proposing a three-year lease with a term providing for the conditions and terms under which Alef Judaica's showroom might be moved within the Merchandise Mart, The Mart represented to Alef Judaica that it would be able to have a showroom in the Merchandise Mart throughout the three-year term of the Lease.

22.     Shortly after entering into the new lease, Alef Judaica moved its showroom to the 12th floor of The Merchandise Mart.  The first show that Alef Judaica did from that new location was the 2007 Summer Show.

**C.     The Mart Informs Alef Judaica That The 12th floor Is To Be Used For Another Purpose And Requires Alef Judaica To Vacate Its New Showroom.**

23.     In July 2007, despite Alef Judaica having just entered into a new lease and moved into its new showroom at The Mart's urging, Mark Furlet, The Mart's Director of Leasing, approached Alef Judaica during 2007 Summer Show and informed Alef Judaica that The Mart had decided to use the 12th floor for other purposes.  As a result, Furlet informed Alef Judaica that all of the showrooms on the floor, including Alef Judaica's new showroom, would have to be vacated.  While some tenants were given the option to move into vacant spaces on the 13th floor, The Mart told Alef Judaica it would not be able to move back to the 13th floor and instead would have to become a temporary tenant.

24.     As a temporary tenant, Alef Judaica would not have a showroom at the Merchandise Mart and instead would have to rent space on a show-by-show basis.  Without a showroom, Alef Judaica would not be able to display its entire product line, both because of the

decreased size of a temporary space and the added costs and risks associated with shipping its products back and forth between the Merchandise Mart and Alef Judaica's California headquarters.

25.    Responding to The Mart's request, Mr. Arenson told The Mart's Furlet that Alef Judaica was not interested in becoming a temporary tenant and instead wished to maintain a permanent showroom for the remaining two-plus years of the Lease.

26.    Later during the 2007 Summer Show Furlet again told Alef Judaica that The Mart wanted it to become a temporary tenant.  Once again, Alef Judaica rejected the idea.  In response to this second rejection, Furlet told Alef Judaica that if Alef Judaica did not want to move, The Mart would simply build around its showroom and leave it as an island on the 12th floor.

27.    With The Mart insisting on Alef Judaica leaving the showroom that The Mart had convinced Alef Judaica to move to and Alef Judaica wishing to live by the terms of its three-year lease for that showroom, the Summer Show ended with the parties agreeing to disagree as to what would happen regarding the showroom.  Following the show, Alef Judaica confirmed its position by emailing Furlet to reiterate its desire to remain in a permanent showroom for the term of its lease.

28.    At no time during the 2007 Summer Show, nor at any other time in the months that followed, did The Mart provide Alef Judaica with written notice of its intention to terminate the Lease, as required by the terms of the Lease that The Mart drafted.

29.    The Mart's insistence that it move out of its new showroom and become a temporary tenant meant Alef Judaica could not know whether it would be able to use its new showroom for the 2008 Winter Show—the next event for which it would need a showroom.  Accordingly, in response to The Mart's announced intention to breach the Lease and to minimize

any damages that would result from such a breach, Alef Judaica ceased paying The Mart rent following the 2007 Summer Show.

30.    Despite The Mart's insistence that Alef Judaica move out of its new showroom, Alef Judaica did not hear anything further from The Mart in the months that followed the 2007 Summer Show.  During this time, Alef Judaica did, however, hear about other tenants who were being forced out of showrooms near Alef Judaica's.  Some of these tenants were offered the opportunity to move to the 13th Floor, while others were not.  Still other tenants, especially those with only a few months left on their leases and including tenants looking to get out of their leases, were told they would be held to the terms of their leases unless they bought out the lease.  Through these inconsistent policies, The Mart sought to maximize its revenue without regard to the legal rights of its tenants, even going so far as to take conflicting positions as to the enforcement of its lease with those tenants.

**D.    The Mart Refuses To Allow Alef Judaica To Participate In The 2008 Winter Show Unless It Abandons Its Showroom.**

31.    As the end of 2007 approached, both The Mart and Alef Judaica began planning for the 2008 Winter Show.  At this time, The Mart informed Alef Judaica that unless Alef Judaica agreed to abandon its 12th floor showroom—its valid three-year lease notwithstanding—Alef Judaica would not be allowed to participate in the 2008 Winter Show, either as a permanent or temporary tenant.

32.    When The Mart's latest threat did not cause Alef Judaica to agree to the unlawful termination of its lease, Cary Schiff, an attorney representing The Mart, contacted Alef Judaica's Lance Arenson to inquire what, if anything, he could do to resolve the situation.  Once more, Alef Judaica informed The Mart—this time through its attorney, Mr. Schiff—that it did not want to be a temporary tenant and would not agree to the termination of its lease.

33.     In response, Mr. Schiff attempted to find a solution that would satisfy both sides. He could not, though, locate another permanent showroom for Alef Judaica.  As a result, around November 21, 2007, Alef Judaica reluctantly agreed that it would be temporary tenant for the 2008 Winter Show.  In exchange for Alef Judaica's agreement, The Mart, through Mr. Schiff, agreed that it would continue seeking a permanent showroom and granted Alef Judaica a right of first refusal on appropriate vacant showrooms.

34.     Mr. Schiff was to draft an agreement reflecting the parties' agreement.  In the weeks that followed, however, Mr. Schiff failed to provide a draft that reflected the terms actually agreed to by the parties.  Instead, The Mart, through Mr. Schiff, presented multiple drafts containing material terms that differed from those agreed to by the parties.  Accordingly, Alef Judaica rejected each draft and no written agreement was ever finalized.

35.     Nonetheless, in early December 2007 and as the parties were exchanging drafts of the proposed written agreement, Alef Judaica informed The Mart that, as The Mart required, it would be moving its materials out of its showroom on the 12th floor.

36.     On December 18, 2007, Alef Judaica's Lance Arenson wrote to The Mart's representatives, including Mr. Schiff, informing them that, as planned, an Alef Judaica employee was travelling to Chicago to pack up the showroom.  In response, Mr. Schiff threatened that The Mart would nonetheless seek judgment and a possession order against Alef Judaica.  Responding to its own lawyer's threat, The Mart, through Cheryl Longstreet, wrote a few minutes later to say that, assuming Alef Judaica could again confirm that it had already begun moving out of its space, The Mart could hold off on seeking a judgment.    Minutes after that, Mr. Arenson confirmed that Alef Judaica had indeed begun moving out and The Mart did not follow through on its threat.

37.    As of December 20, 2007, Alef Judaica had moved out of its showroom in The Mart and turned the keys to the space in to The Mart's Mark Furlet.

38.    Even after Alef Judaica moved out of its showroom, The Mart continued to change terms of the parties' agreement regarding the termination of the lease.  In particular, The Mart refused to include the agreed-upon right of first refusal on a new showroom for a period of time sufficient to assure Alef Judaica that it would actually be able to get a new showroom at The Mart.

39.    By January 22, 2008, the parties were still in negotiations regarding the written agreement.  At that time, The Mart, again acting through its attorney, imposed a deadline for those negotiations by insisting that Alef Judaica accede to The Mart's terms for the written agreement and sign their version of it by the end of the 2008 Winter Show.  When Alef Judaica did not simply agree to The Mart's terms, The Mart set a new deadline of February 1, 2008.  Once more, Alef Judaica refused to simply give in.

40.    As a result, the parties never executed a written agreement to terminate the lease for Alef Judaica's 12th floor showroom at The Merchandise Mart.  Nonetheless, through threats and other means, The Mart effectively terminated the lease during the 2007 Summer Show, resulting in Alef Judaica moving out of the showroom on December 20, 2007.

**E.    Alef Judaica Participates In The 2008 Winter Show As A Temporary Tenant.**

41.    Alef Judaica participated in the 2008 Winter Show as a temporary tenant with approximately 200 square feet of space in which to show its products.  At this show, Alef Judaica's sales dropped precipitously from prior years, as Alef Judaica failing to make even $2,000 in sales.

## COUNT I – FRAUDULENT INDUCEMENT

42.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

43.    To convince Alef Judaica to agree to move its showroom from the 13th floor of The Merchandise Mart, the Mart made material misrepresentations and omissions to Alef Judaica that caused Alef Judaica to agree to the new Lease and move its showroom. Specifically, by suggesting that Alef Judaica move its showroom to the 12th floor and enter into the new Lease, The Mart misrepresented to Alef Judaica that Alef Judaica would be able to use its new showroom on the 12th floor throughout the three-year term of that lease.

44.    At the time The Mart sought to have Alef Judaica move its showroom, The Mart knew that it planned to use the 12th floor for other purposes—purposes which would prevent Alef Judaica from using its new showroom throughout the three-year term of the new Lease.  By failing to inform Alef Judaica of The Mart's plans to use the 12th floor for other purposes prior to the end of the Lease, The Mart misrepresented its intentions to Alef Judaica.

45.    In making these misrepresentations and omissions, The Mart intended for Alef Judaica to rely on them and, in agreeing to move and enter into the Lease, Alef Judaica did rely on them without knowing that they were false.

46.    The Mart made the misrepresentations and omissions willfully and maliciously, disregarding Alef Judaica's interests and rights by attempting to empty the 13th Floor of the Merchandise Mart to make room for tenants The Mart would soon choose to move from the 12th floor.

47.    By fraudulently inducing Alef Judaica into entering into the Lease and then implementing its plan to use the 12th floor for different purposes, The Mart caused Alef Judaica

to lose its showroom.  As a result of The Mart's actions, Alef Judaica suffered damages in excess of $200,000.

## COUNT II – CONSUMER FRAUD

48.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

49.    The Mart deceived Alef Judaica into agreeing to move its showroom from the 13th floor of The Merchandise Mart by representing to Alef Judaica that it would be able to use its new showroom throughout the three-year term of that lease despite The Mart knowing that it planned to use that floor for other purposes prior to the end of the Lease.

50.    The Mart intended for Alef Judaica to rely on The Mart's deception and, in agreeing to move its showroom and enter into the Lease, Alef Judaica relied on that deception.

51.    Because The Mart's deceptions related to the Lease between it and Alef Judaica, The Mart's deceptions occurred in the conduct of commerce.

52.    The Mart deceived Alef Judaica willfully and maliciously, disregarding Alef Judaica's interests and rights by attempting to empty the 13th Floor of the Merchandise Mart to make room for tenants The Mart would soon choose to move from the 12th floor.

53.    As a result of The Mart's deception, Alef Judaica entered into the new Lease and lost its showroom when The Mart implemented its plan to use the 12th floor for different purposes.  The Mart's actions resulted in Alef Judaica suffering damages in excess of $200,000.

## COUNT III – BREACH OF CONTRACT

54.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

55.    Alef Judaica and The Mart entered into the Lease, a valid lease agreement, on April 16, 2007.

56.    Beginning in July 2007—only months after Alef Judaica moved into its new showroom and with nearly three years remaining on the Lease—The Mart announced to Alef Judaica its intention to breach the Lease by requiring Alef Judaica to move out of its new showroom.

57.    From July 2007 until December 20, 2007, The Mart demanded that Alef Judaica vacate the showroom that The Mart had convinced it move into earlier that year.

58.    Despite having the right under the lease to move Alef Judaica to other, similar space in The Merchandise Mart, The Mart never invoked its right under the Lease to move Alef Judaica into another space.  Similarly, The Mart never provided Alef Judaica with proper written notice that the Lease was being terminated.  Instead, in violation of the terms of the Lease, it simply demanded that Alef Judaica move out of its permanent showroom and become a temporary tenant.

59.    Alef Judaica performed all of its obligations under the Lease prior to The Mart's announcement of its intent to breach the Lease.

60.    As a result of The Mart's breaches of the parties' Lease, Alef Judaica was forced out of its permanent showroom and has suffered and will continue to suffer damages as a result. The Mart's breach of the Lease denied Alef Judaica the use of its showroom during five of the six shows scheduled to occur during the term of that lease, resulting in the loss of sales of over $200,000.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Alef Judaica, Inc. requests that the Court enter judgment in its favor and against Defendant Merchandise Mart L.L.C. and enter an Order awarding the following damages:

A.    For compensatory damages for Counts I, II, and III;

B.    For punitive and exemplary damages for Counts II and III;

C.    For post-judgment interest at the rate prescribed under applicable law;

D.    For reasonable attorneys fees and costs under the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS § 505 et seq.;

E.    For such further, additional, or other relief the Court deems just and

proper.

Dated: June 12, 2008                    ALEF JUDAICA, INC.


                                        By:    s/ Max A. Stein_____
                                              One of its Attorneys

                                        Max A. Stein
                                        REED SMITH LLP
                                        10 South Wacker Drive
                                        Chicago, Illinois 60606-7507
                                        (312) 207-1000


2182695.1

08CV3408
JUDGE LINDBERG
MAGISTRATE JUDGE BROWN
EDA

# EXHIBIT 1

## THE MERCHANDISE MART
### (Standard Short Form Gift Lease)

This Lease made on ~~April 16~~, 2007, between **MERCHANDISE MART L.L.C.**, a Delaware limited liability company, having an office c/o Merchandise Mart Properties, Inc., 222 Merchandise Mart Plaza, Suite 470, Chicago, Illinois  60654 ("Landlord") and **ALEF JUDAICA, INC.**, a California corporation ("Tenant"), having an office at 8440 Warner Drive, Culver City, California 90232

#### Witnesseth

**1. PREMISES; TERM.** Landlord leases to Tenant and Tenant accepts that space hatched on Exhibit "A" commonly described as Room 12-630 consisting of approximately 656 rentable square feet ("Premises") on the sixth floor of The Merchandise Mart, 222 Merchandise Mart Plaza ("Building") in Chicago, Illinois, 60654 (the "Property"), for a term beginning June 1, 2007 and ending May 31, 2010 ("Term"), unless sooner terminated as provided herein, subject to the terms, covenants and agreements herein contained.

**2. USE. (A)** Tenant will use and occupy the Premises for the display and sale at wholesale only of gifts and decorative accessories and related merchandise and for no other use or purpose whatsoever. Notwithstanding anything to the contrary herein contained, it is expressly understood and agreed that Tenant, at a minimum, shall conduct business in the Premises during Markets. The term "Markets" shall mean the period beginning two weeks prior to and ending one week following a Building - sponsored market event serving the gift and decorative accessories industry. Periodic visits by buying groups also constitute a Market. Landlord reserves the right to designate Markets from time to time. Tenant acknowledges and agrees that the regular conduct of business by each tenant affects the business of other tenants in the Building. Therefore, it is of the essence of this Lease, and Tenant covenants and agrees to continuously operate one hundred percent of the Premises at all times during each Market of the Term, unless prevented from doing so because of fire, accident, acts of God, or other cause beyond Tenant's reasonable control excluding financial causes, and Tenant agrees to keep open the Premises and diligently operate the business therein, using a sufficient number of adequately trained personnel for efficient service, during such hours and on such days as may be determined by Landlord. Tenant agrees to conduct Tenant's business at all times in a first-class manner consistent with reputable business standards and practices, in good faith and in such manner that the high reputation of the Building is maintained. Tenant agrees to keep the Premises adequately stocked with appropriate merchandise in first-class condition. **(B)** Through the end of the scheduled Term, neither Tenant nor any of its owners, principals, officers, or subsidiaries, direct or remote, nor any of its affiliates or entities under common control of or with any of the foregoing (Tenant and such parties herein collectively referred to as the "Tenant Parties") shall directly or indirectly engage in, own, operate, control or have a financial interest in any showroom business (permanent or temporary in nature) similar to that authorized to be conducted hereunder, or use or permit the use of the same or similar tradenames or uses, within 50 miles of the Building; provided, however, that nothing in this Paragraph B shall require that any of the Tenant parties violate any laws. **(C)** Landlord and Tenant agree that the provisions in the above Paragraphs A & B goes to the essence of their agreement under this Lease and that any violation of any of the requirements or prohibitions in or Paragraphs A & B will result in damages that will be substantial, but that are impossible to determine and for which Landlord's remedies at law therefore will not be adequate. Accordingly, Landlord and Tenant agree that as a fair and reasonable estimate and liquidation of Landlord's damages, and not as a penalty, if there shall be any violation of any one or more of the requirements or prohibitions under the above Paragraph B then Tenant shall pay to Landlord, as additional rent in addition to all other amounts due from Tenant under this Lease, an amount equal to the greater of (x) $500.00 per day, or (y) two hundred percent (200%) of the stated Base Rent for the month in which Tenant so violates this provision, plus two hundred percent (200%) of one-twelfth (1/12) of the additional rent in effect from time to time, for the period or periods during which such violation shall exist, computed on a per diem basis. Upon the first demand for such payment by Landlord, Tenant shall forthwith make such payment as to all periods in which any such violation existed prior to the date of such demand, and, without further demand, on the first day of each and every month thereafter during which any such violation shall continue to exist. Acceptance by Landlord of such liquidated damages shall not be deemed permission for any of the Tenant Parties to continue any such violation or to constitute a waiver by Landlord of such default under this Lease by Tenant on account thereof. Further, such demand by Landlord and acceptance of such liquidated damages shall not affect or reduce any of Tenant's other obligations under this Lease or preclude Landlord from seeking any other remedies (other than monetary damages) in addition to said liquidated damages for such violation, including without limitation, injunction, specific performance, termination of this Lease or Tenant's right to possession as described in Articles 10 and 11 of this Lease, and/or any other remedy otherwise available under this Lease, at law or in equity. If for any reason any portion of this Article shall be unenforceable or invalid, then the unenforceable or invalid portion shall be deemed reasonably modified to the minimum extent required to render it enforceable or valid, or if no such modification can accomplish that result then such portion shall be deleted and the remainder of this Article shall remain in full force and effect. **(D)** Tenant will fully and promptly comply, and operate the Premises in conformity with all applicable federal, state and municipal laws, ordinances, codes, rules, regulations, court order or decree and requirements ("Legal Requirements") respecting the Premises or Tenant's use or occupancy thereof, and activities therein. Tenant will not conduct or permit to be conducted on the Premises any business or activity which is contrary to the provisions of this Lease or to any Legal Requirement. Tenant shall at no time sell food or alcoholic beverages on or from the Premises, provided, however, that Tenant may occasionally give complimentary food and alcoholic liquor to its guests on the Premises, on condition that Tenant shall comply with all Legal Requirements, and on further condition that, prior to the giving of such alcoholic liquor, Tenant shall procure and maintain continuously thereafter in force host liquor liability insurance as set forth in Article 16 hereof.

**3. BASE RENT.** Tenant shall pay to Landlord base rent ("Base Rent") for the Premises as follows:

| PERIOD | ANNUAL BASE RENT | MONTHLY INSTALLMENT |
|---|---|---|
| 06/01/07 – 05/31/10 | $23,150.24 | $1,929.19 |

Tenant shall pay each installment in advance on the first day of each calendar month without any prior demand and without any deductions or set-offs whatsoever. All payments shall be made payable to Landlord or Landlord's agent at such places and to such parties as Landlord or its agent shall from time to time by written notice appoint. The obligation of Tenant with respect to Base Rent shall survive the expiration or termination of this Lease.

**4. CONDITION OF PREMISES; POSSESSION.** Tenant's entry into possession of any part of the Premises shall be conclusive evidence that the Premises were in good order and satisfactory condition when Tenant took possession. Tenant acknowledges that no promise of Landlord or its agents to alter, remodel or improve the Premises or the Building and no representation respecting the condition of the Premises or the Building have been made by Landlord or its agents to Tenant. If possession of the Premises is not delivered to Tenant on the commencement of the Term, this Lease shall nevertheless continue in full force and effect, and no liability shall arise against Landlord out of any such delay beyond the abatement of rent until possession of the Premises is delivered to Tenant. If Tenant, with Landlord's permission, shall enter possession of all or any part of the Premises prior to the first day of the Term, all of the covenants and conditions of this Lease shall be binding upon the parties hereto in respect of such possession the same as if the first day of the Term had been fixed as of the date when Tenant entered such possession. It is expressly understood that no liability, by abatement of rent or otherwise, shall arise against Landlord as a result of delays in occupancy caused by decoration or other work in the Premises, done by Landlord or Tenant, under this Lease or any other agreement.

**5. REPAIRS; ALTERATIONS.** Tenant will at its own expense keep the Premises in good repair and condition at all times during the Term, and Tenant shall promptly and adequately repair all damages to the Premises (except for reasonable wear and tear and as otherwise provided in Article 15 of this Lease) under the direct supervision and with the approval of Landlord, and within any reasonable period of time specified by Landlord. If Tenant does not do so, or at Landlord's election, Landlord may make such repairs or replacements and the costs to Landlord for such repairs and replacements shall be deemed additional rent reserved under this Lease. Landlord may, but shall not be required to, enter the Premises at all reasonable times to make repairs, alterations, improvements, replacements, decorations and additions (collectively, "Improvements"), as Landlord shall desire or deem necessary for the safety, preservation or improvement of the Premises or the Building or any equipment in the Building, or as Landlord may be required to do by any Legal Requirement. In the event Landlord or its agents or contractors shall elect or be required to make Improvements to the Premises or the Building or any equipment located in the Building, Landlord shall be allowed to take into the Premises all material required to make such Improvements, and, during

1

the continuance of said work, to temporarily close doors, entryways, public space and corridors in the Building and to interrupt or temporarily suspend Building services and facilities without being deemed or held guilty of eviction of Tenant or for damages to Tenant's property, business or person, and the rent reserved herein shall in no way abate while said Improvements are being made, and Tenant shall not be entitled to maintain any set-off or counterclaim for damages of any kind against Landlord by reason thereof. Tenant shall not, without the prior written consent of Landlord in each instance, make Improvements to the Premises. If Tenant desires to make any Improvements, Tenant shall first seek Landlord's consent therefor, and Landlord's consent to such Improvements shall be conditioned upon requirements Landlord deems appropriate. All Improvements shall be done at Tenant's expense by employees or agents of Landlord or contractors hired by Landlord. Tenant shall pay to Landlord for its agent a charge in connection with such Improvements, as established by Landlord from time to time. All Improvements shall comply with all insurance requirements and with all Legal Requirements. All Improvements shall be constructed in a good and workmanlike manner and only good grades of material shall be used. Except for Landlord's negligence, Tenant shall protect, defend, indemnify and hold Landlord, the Building and the Property, Landlord's beneficiaries, and their respective officers, directors, beneficiaries, members, shareholders, partners, agents and employees (collectively, the "Protected Parties") harmless from any and all liabilities of every kind and description which may arise out of or in connection with Improvements. All Improvements made by Landlord or Tenant in or upon the Premises whether temporary or permanent in character, including but not limited to wall coverings, carpeting and other floor covering, lighting installations, built-in or attached shelving, cabinetry, and mirrors, shall become Landlord's property and shall remain upon the Premises at the termination of this Lease whether by lapse of time or otherwise without compensation to Tenant [excepting only Tenant's movable office furniture, trade fixtures (other than attached or installed lighting equipment and cans), and office equipment]. Tenant agrees to pay promptly for any work done or materials furnished by or on behalf of Tenant in or about the Premises or to the Property. Tenant covenants and agrees not to suffer or permit any lien or encumbrance to be placed against the Premises, the Building or the Property with respect to work or services claimed to have been performed for or materials claimed to have been furnished to Tenant or the Premises and, in case of any such lien or encumbrance being asserted, to cause it to be immediately released and removed of record. If Tenant has not removed any such lien or encumbrance within fifteen (15) days after notice to Tenant by Landlord, such failure shall constitute a default hereunder and, in addition to all other remedies available herein, Landlord may, but shall not be obligated to, pay the amount necessary to remove the lien or encumbrance, without being responsible for making any investigation as to the validity thereof, and the amount so paid together with all costs and expenses, including reasonable attorneys' fees, incurred in connection therewith shall be deemed additional rent reserved under this Lease due and payable forthwith.

**6. SERVICES.** Landlord shall provide the following building standard services on all days during the Markets, unless otherwise stated: (A) heat will be furnished whenever in Landlord's judgment such is required for the comfortable occupation of the Premises; (B) adequate elevator service daily as determined by Landlord; (C) conditioned air to the Premises at such times as Landlord's air conditioning system is in operation, and (D) electricity (up to four and one-half (4.5) watts per square foot) for lighting and receptacles. Whenever heat-generating machines, equipment or lighting fixtures installed by Tenant affect the temperature otherwise maintained by Landlord in the Premises, or whenever the electrical load in the Premises exceeds four and one-half (4.5) watts per rentable square foot, Landlord shall be relieved of responsibility for maintaining air conditioning in the Premises, and in such event Landlord further reserves the right to require Tenant to discontinue use of such heat-generating machines, equipment, lighting fixtures or excessive electrical load. Tenant agrees that at all times it will cooperate with Landlord and abide by all regulations and requirements which Landlord may prescribe for the proper functioning of the ventilating and air conditioning systems. All charges for any additional services shall be deemed rent reserved under this Lease and shall be due and payable within ten (10) days after such billing. If Tenant shall fail to pay for such services Landlord may, in addition to all other remedies which Landlord may have for the non-payment of rent and without notice to Tenant, discontinue any or all such services (including, without limitation, electric current for light and power in the Premises), and such discontinuance shall not be held or pleaded as an eviction or as a disturbance in any manner whatsoever of Tenant's possession, or relieve Tenant from the payment of rent when due, or vary or change any other provision of this Lease or render Landlord liable for damages of any kind whatsoever. Tenant agrees that neither Landlord nor any other of the Protected Parties shall be liable to Tenant, or any of Tenant's employees, agents, customers or invitees of anyone claiming through, by or under Tenant, for any damages, injuries, losses, expenses, claims or causes of action, because of any interruption, diminution, delay or discontinuance ("Interruption") at any time in the furnishing of any of the above services or operating, maintaining, repairing or supervising the property when such Interruption is occasioned, in whole or in part, by repairs, renewals, improvements or additions; by any strike, lockout or other labor trouble; by inability to secure gas, electricity, water or other fuel at the Building; by any accident or casualty whatsoever; by act or default of Tenant or other parties; or by any other cause beyond Landlord's reasonable control; nor shall any such Interruption be deemed an eviction or disturbance of Tenant's use or possession of the Premises or any part thereof; nor shall any such Interruption relieve Tenant from the full performance of its obligations hereunder.

**7. WAIVER OF CLAIMS.** Subject to the provisions of Article 16 hereof, and except for the negligence of Landlord, Tenant agrees that the Protected Parties shall not be liable for (nor shall rent abate as a result of) any direct or consequential damage (including, without limitation, damages claimed for actual or constructive eviction) either to person or property sustained by Tenant or other person, due to the Building, the Property, or any part or any appurtenances thereof becoming out of repair, or due to the happening of any accident in or about the Building or the Property, or due to any act or neglect of any tenant or occupant of the Building or the Property, or any other person. This provision shall apply particularly (but not exclusively) to damage caused by fire, explosion, water, snow, frost, steam, sewerage, sewer gas or odors, or by the bursting or leaking of pipes, plumbing fixtures, or sprinkler system; without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the causes specifically enumerated above or to some other cause of an entirely different kind. Tenant further agrees that all personal property upon the Premises or brought or caused to be brought within the Building by Tenant shall be at the risk of Tenant only and that Landlord shall not be liable for any damage thereto or any theft thereof. Subject to the provisions of Article 20 hereof, and except for the negligence of Landlord, Tenant shall protect, indemnify, defend and save the Protected Parties harmless from and against any and all liabilities, damages, costs, claims, obligations and expenses arising out of or in connection with Tenant's use or occupancy of the Premises or Tenant's activities in or about the Building or the Property, or arising from any act or negligence of Tenant or its agents, contractors, servants, employees or invitees.

**8. ASSIGNMENT AND SUBLETTING.** Tenant shall not, without the prior written consent of Landlord: (A) assign, convey, mortgage, pledge or otherwise transfer this Lease, or any part thereof, or any interest hereunder; (B) permit any assignment of this Lease, or any part thereof, by operation of law; (C) sublet the Premises or any part thereof; or (D) permit the use of the Premises, or any part thereof, by any parties other than Tenant, its agents and employees. Notwithstanding anything else herein to the contrary, in no event shall Tenant assign and/or sublet all or any portion of the Premises (i) in contravention of the terms of this Lease regarding use set forth in Article 2 above; (ii) to any existing tenant in the Building or the adjacent 350 North Orleans building (the "350 Building") unless Landlord or the owner of the 350 Building cannot accommodate such existing tenant's needs due to the occupancy levels in the Building and/or the 350 Building or (iii) to any prospective tenant with whom Landlord or the owner of the 350 Building is in bona fide negotiations for space at the Building and/or 350 Building. Landlord's consent may be granted or withheld in its sole and absolute discretion. Landlord's consent to any assignment or sublease shall not operate as a consent to any subsequent assignment or sublease or as a waiver of Landlord's right to require Tenant to seek Landlord's approval of all subsequent assignments and subleases. Any subletting or assignment hereunder shall not release or discharge Tenant of or from any liability, whether past, present or future, under this Lease, and Tenant shall continue fully liable thereunder. Any sale, assignment, mortgage, transfer, or subletting of this Lease which is not in compliance with the provisions of this Article shall be of no effect and void. Notwithstanding any requirement for Landlord to consider, solicit or obtain a sublease or assignment, whether statutory or otherwise, Landlord and Tenant expressly agree that Landlord's obligation with respect to such sublease or assignment shall arise only when Tenant submits such sublease or assignment to Landlord in the manner set out in this Article 8.

Notwithstanding any other provisions of this Lease, neither Tenant nor any direct or indirect assignee or subtenant of Tenant may enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Premises which would require the payment of rent based on the net profits of any person or of any consideration that would not fall within the definition of "rents from real property", as that term is defined in Section 856(d) of the Internal Revenue Code of 1986, as amended.

**9. REMEDIES.** If default shall be made: (A) in payment of rent or any installment thereof or in payment of any other sum required to be paid by Tenant under this Lease, or under the terms of any other lease or agreement between Landlord and Tenant, and such default shall continue for ten (10) days after written notice to Tenant; or (B) in the performance of any of the other covenants or conditions which Tenant is required to observe and perform hereunder or under any other lease or agreement between Landlord and Tenant and such default shall continue for thirty (30) days after written notice to

Tenant; or (C) if the interest of Tenant in this Lease shall be levied on under execution or other legal process, or if any petition shall be filed by or against Tenant to declare Tenant a bankrupt or to delay, reduce or modify Tenant's debts or obligations or if any petition shall be filed or other action taken to reorganize or modify Tenant's capital structure, if Tenant be a corporation or other entity, or if Tenant be declared insolvent according to law or if any assignment of Tenant's property shall be made for the benefit of creditors or if a receiver or trustee is appointed for Tenant or its property; or (D) if Tenant shall abandon or vacate the Premises during the Term, Landlord may treat the occurrence of any of the foregoing events as a breach of this Lease, and at its option may, without notice or demand of any kind to Tenant or any other person, have any one or more of the following described remedies in addition to all other rights and remedies at law or in equity: (1) Landlord may terminate this Lease and the Term created hereby, in which event Landlord may forthwith repossess the Premises and be entitled to recover forthwith as damages a sum of money equal to the value of the rent provided to be paid by Tenant for the balance of the stated Term of the Lease less the fair rental value of the Premises for such period and any other sum of money and damages owed by Tenant to Landlord; (2) Landlord may terminate Tenant's right of possession and may repossess the Premises by forcible entry and detainer suit, or otherwise, without demand or notice of any kind to Tenant and without terminating this Lease, in which event Landlord may, but shall be under no obligation to relet all or any part of the Premises for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Premises for a term greater or lesser than that remaining under the Term and the right to relet the Premises as a part of a larger area and the right to change the character or use made of the Premises). For the purpose of such reletting, Landlord may make such repairs, changes, alterations or additions in or to the Premises as may be necessary or convenient. If Landlord shall fail or refuse to relet the Premises, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rent reserved in this Lease for such period or periods. If the Premises are relet and a sufficient sum shall not be realized from such reletting after paying all of the costs and expenses of such repairs, changes, alterations and additions and the expense of such reletting and the collection of the rent accruing therefrom, to satisfy the rent above provided to be paid, Tenant shall satisfy and pay any such deficiency upon demand therefor from time to time; and Tenant agrees that Landlord may file suit to recover any sums falling due under the terms of this paragraph from time to time and that any suit or recovery of any portion due Landlord hereunder shall be no defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord; (3) Tenant shall pay all attorneys' fees and expenses of Landlord incurred in enforcing any of the obligations of Tenant under this Lease. In case Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, then Tenant shall pay all cost, expense and reasonable attorneys fees incurred or paid by Landlord in connection with such litigation.

**10. SURRENDER OF POSSESSION.** On or before the date this Lease and the Term hereby created terminate, or on or before the date Tenant's right of possession terminates, whether by lapse of time or at the option of Landlord, Tenant will: (A) restore the Premises to the same condition they were in at the beginning of the Term (except for reasonable wear and tear and as otherwise provided in Article 15 of this Lease); (B) remove from the Premises and the Building all of Tenant's personal property; and (C) surrender possession of the Premises to Landlord. If Tenant shall fail or refuse to restore the Premises to the above-described condition on or before the above date, Landlord may enter the Premises and put the Premises in such condition, and recover from Tenant Landlord's cost of so doing. If Tenant shall fail or refuse to comply with Tenant's duty to remove all personal property from the Premises and the Building on or before the above-specified date, the parties hereto agree and stipulate that Landlord may treat such failure or refusal as conclusive evidence, on which Landlord and any third party shall be entitled absolutely to rely and act, that Tenant has forever abandoned such personal property, and without accepting title thereto Landlord may at Tenant's expense enter the Premises and remove, sell, retain, donate, destroy, store, discard or otherwise dispose of all or any part thereof in any manner that Landlord shall choose without incurring liability to Tenant or to any other person. In no event shall Landlord ever become or accept or be charged with the duties of a bailee (either voluntary or involuntary) of any personal property; and the failure of Tenant to remove all personal property from the Premises and the Building shall forever bar Tenant from bringing any action or from asserting any liability against Landlord with respect to any such property which Tenant fails to remove.

**11. HOLDOVER.** Tenant will pay to Landlord an amount equal to double the sum of the annual Base Rent as provided in Section 5/9-202 of Chapter 735 of the Illinois Compiled Statutes, or any corresponding provision of a successor statute, and in addition thereto all actual damages, whether direct or consequential, sustained by Landlord, for all the time Tenant shall retain possession of the Premises or any part thereof after the termination of this Lease, whether by lapse of time or otherwise. The provisions of this Article shall not operate as a waiver by the Landlord of any right of re-entry hereinbefore provided.

**12. NOTICE.** In every case where it shall be necessary or desirable for Tenant or Landlord to give or serve upon the other any notice or demand ("Notice"), such party shall give the requisite Notice by sending a written or printed copy of such Notice by certified mail, return receipt requested, postage prepaid, addressed to the other at the address above.

**13. CONDEMNATION.** If the whole or any part of the Premises or Building shall be taken or condemned for any public use or purpose or if any adjacent property or street shall be condemned or improved in such manner as to require the use of any part of the Premises or Building, then the Term of this Lease, at the option of Landlord, shall end upon the date when the possession of the part so taken shall be required for such use or purpose and Landlord shall be entitled to receive the entire award, if any, without any payment to Tenant. Current rent shall be apportioned as of the date of such termination.

**14. WAIVER OF NOTICE.** Except as provided in Article 9, Tenant hereby expressly waives the service of any other Notice of intention to terminate this Lease or to re-enter the Premises and waives the service of any demand for payment of rent or for possession and waives the service of any other Notice prescribed by any statute or other law. No waiver of any condition expressed in this Lease shall be implied by any neglect of Landlord to enforce any remedy on account of the violation of such condition if such violation be continued or repeated subsequently, and no express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. The receipt and acceptance by Landlord of a sum of money which is less than the amount due and owing shall not, regardless of any endorsements or instructions to the contrary, constitute an accord and satisfaction. No receipt of moneys by Landlord from Tenant after the termination in any way of the Term hereof or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Term or affect any Notice given to Tenant prior to the receipt of such moneys, it being agreed that after the service of Notice or the commencement of a suit or after final judgment for possession of the Premises Landlord may receive and collect any rent due, and the payment of such rent shall not waive or affect such Notice, suit or judgment.

**15. FIRE OR CASUALTY.** If the Premises or the Building (including machinery and equipment used in its operation) shall be destroyed or damaged by fire or other casualty and if the Premises or Building may be repaired and restored within ninety (90) days (plus such additional time during which Landlord may be prevented or delayed from completing the repairs for causes beyond its reasonable control, including without limitation, adjustments on insurance policies) after such damage then Landlord shall have the option to either (A) repair and restore the same with reasonable promptness; or (B) demolish the Premises or the Building or cease its operation, in which event this Lease shall automatically be canceled and terminated as of the date of such damage. In the event any such damage not caused by the act or neglect of Tenant, its agents, servants or employees, renders the Premises untenantable and if this Lease shall not be cancelled and terminated by reason of such damage, then rent shall abate during the period beginning with the date of such casualty and ending with the date Landlord's work is substantially completed, abatement to be in an amount bearing the same ratio to the total amount of rent for such period as the untenantable portion of the Premises bears to the entire Premises. Landlord's work shall not include, and Landlord shall have no duty relating to, the repair or restoration of Tenant's fixtures or Improvements (including Improvements acquired by Tenant from former tenants or existing in the Premises as of the date such space is leased to, or occupied by, Tenant), including, but not limited to, special wall and floor coverings, special lighting fixtures, built-in cabinets and bookshelves and glass demising walls. If such damage renders the Premises untenantable, in whole or in part, and if, in Landlord's judgment, such damage cannot reasonably be repaired and restored within ninety (90) days (plus such additional time during which Landlord may be prevented or delayed from completing the repairs for causes beyond its reasonable control, including without limitation, adjustments on insurance policies), either party shall have the right to cancel and terminate this Lease as of the date of such damage, provided, however, that Tenant may not elect to terminate this Lease if such damage was caused by the act or neglect of Tenant, its agents, servants or employees. Any right to terminate or any other option provided for any party in this Article 15 must be exercised by written notice to the other party served within one hundred (100) days after such damage shall have occurred.

**16. INSURANCE.** In consideration of the leasing of the Premises at the rental stated in Article 3, Landlord and Tenant agree to provide insurance and allocate the risk of loss as follows: (A) Tenant, at its sole cost and expense, agrees to purchase and keep in force and effect during the Term

hereof (1) Property Insurance on its Improvements, (including Improvements acquired by Tenant from former tenants or existing in the Premises as of the date such space is leased to, or occupied by, Tenant) merchandise, inventory, contents, furniture, fixtures, equipment and other personal property located in the Building, protecting Landlord and Tenant from damage or other loss caused by those perils customarily covered by an all risk policy, and in any event, including without limitation, fire or other casualty, vandalism, theft, sprinkler leakage, water damage (however caused), explosion, malfunction and failures of heating and cooling or similar apparatus, perils covered by extended coverage, and other similar perils in amounts not less than the full insurable replacement value of such property with a deductible amount not in excess of One Thousand Dollars ($1,000), (2) broad form Commercial General Liability Insurance, including blanket contractual liability, host liquor liability (if alcoholic liquor within the meaning of the Illinois Liquor Control Act will be given to guests), personal injury liability, and broad form property damage liability coverages, with limits of not less than Two Million Dollars ($2,000,000) for personal injury, bodily injury, sickness, disease or death or for damage or injury to or destruction of property (including the loss of use thereof) for any one occurrence, and (3) Worker's Compensation Insurance in accordance with the laws of Illinois and Employer's Liability Insurance with a limit not less than Five Hundred Thousand Dollars ($500,000.00). Tenant's Property Insurance policy shall provide that it is specific and not contributory and shall contain a clause pursuant to which the insurance carrier waives all rights of subrogation against Landlord with respect to losses payable under such policy. If the potential for Dram Shop liability shall arise due to Tenant's permitted activities Tenant shall procure and maintain a policy of Dram Shop liability insurance before undertaking such activities. Tenant's Property Insurance policy, its Commercial General Liability policy and, if required, its Dram Shop liability policy, shall each name the Protected Parties as additional insureds. All such insurance shall be provided by insurers of recognized responsibility and shall provide that should the policy be cancelled before its expiration date the insurer will mail to Landlord thirty (30) days notice of cancellation. (B) Landlord agrees to purchase and keep in force and effect insurance on the Building against fire and such other risks as may be included in extended coverage insurance from time to time available in an amount sufficient to prevent Landlord from becoming a co-insurer under applicable policies and shall contain a clause pursuant to which the insurance carriers waive all rights of subrogation against Tenant, its agents, servants and employees, with respect to losses payable under such policies. (C) By this Article, Landlord and Tenant intend that the risk of loss or damage as described above be borne by responsible insurance carriers to the extent above provided and Landlord and Tenant hereby release each other and agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a loss of a type described above to the extent that such coverage is agreed to be covered hereunder. For this purpose any applicable deductible amount shall be treated as though it were recoverable under such policies. Landlord and Tenant agree that applicable portions of all moneys collected from such insurance shall be used toward full compliance with the obligations of Landlord and Tenant under this Lease in connection with damage resulting from fire or other casualty.

**17. RESERVED RIGHTS; RULES.** Landlord shall have certain rights set forth in Exhibit "B", exercisable without notice and without liability to Tenant for damages or injury to property, person or business and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession or giving rise to any claim for set-off or abatement of rent. Tenant agrees, for itself, its employees, agents, servants, clients, customers, invitees, licensees and guests to observe and comply, at all times, with the rules and regulations and with such reasonable modifications thereof and additions thereto as Landlord may make for the Building as are currently set forth in Exhibit "B".

**18. MISCELLANEOUS.** Tenant and Landlord further covenant with each other that: (A) All rights and remedies of Landlord hereunder shall be cumulative, and none shall limit or exclude any other rights and remedies allowed by law or equity. (B) The word "Tenant" shall be construed to mean tenants in all cases where there is more than one tenant, and the necessary grammatical changes required to make the provisions hereof apply either to corporations or individuals, men or women, shall in all cases be assumed as though in each case fully expressed. If there is more than one tenant, all obligations and liabilities hereunder imposed upon Tenant shall be joint and several. (C) This Lease and the rights of Tenant hereunder shall be and are subject and subordinate at all times to any ground leases or master leases and to the lien of any mortgages or deeds of trust now or hereafter in force against the Property or the Building, or both of them, and to all advances made or hereafter to be made upon the security thereof, and to all renewals, modifications, amendments, consolidations, replacements and extensions thereof. This provision is self-operative and no further instrument of subordination or priority shall be required. The holder of any note secured by a mortgage or deed of trust, or any mortgage or beneficiary under a deed of trust on the Property or Building (collectively, "Lender"), however, may elect to have this Lease be superior to its mortgage or deed of trust and Tenant hereby consents to such election. At Landlord's request, Tenant shall execute and deliver a document in reasonable form confirming that this Lease is subordinate (or at Landlord's election, superior) to any mortgage or deed of trust and in the event Tenant fails to do so within ten (10) days after demand in writing Tenant hereby irrevocably appoints Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments. Tenant shall give Lender written notice of any default by Landlord under this Lease at the same time Tenant gives notice thereof to Landlord, and Lender shall have a reasonable time (but no obligation) after the expiration of Landlord's cure period within which to cure any such default prior to Tenant taking any action to remedy a default by Landlord hereunder or to cancel this Lease due to a default by Landlord. (D) Each provision of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit of not only Landlord and Tenant, but also their respective heirs, legal representatives, successors and assigns. (E) All of the representations and obligations of Landlord are contained herein and no modification, waiver or amendment of this Lease or any of its conditions or provisions shall be binding upon Landlord unless in writing signed by Landlord. (F) All amounts due and payable from Tenant under this Lease or under any work order or other agreement relating to the Premises shall be considered as rent and, if unpaid when due, shall bear interest from such date until paid at the rate of 9% per annum. (G) Submission of this instrument for examination shall not bind Landlord in any manner, and no lease or obligation on Landlord shall arise until this instrument is signed and delivered by Landlord and Tenant. (H) No rights to light or air over any property, whether belonging to Landlord or any other persons, are granted to Tenant by this Lease. (I) The laws of the State of Illinois shall govern the validity, performance and enforcement of this Lease. The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision. (J) In case Landlord or any successor owner of the Property or the Building shall convey or otherwise dispose of any portion thereof to another person, such other person shall in its own name thereupon be and become Landlord hereunder and shall assume fully in writing and be liable upon all liabilities and obligations of this Lease to be performed by Landlord which first arise after the date of conveyance, and such original Landlord or successor owner shall, from and after the date of conveyance, be free of all liabilities and obligations not then incurred. (K) Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant. (L) Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association or relationship between Landlord and Tenant other than that of landlord and tenant.

**19. ATTORNMENT.** Upon request of the holder of any note secured by a mortgage or deed of trust on the Building or Property, Tenant will agree in writing that no action taken by such holder to enforce said mortgage or deed of trust shall terminate this Lease or invalidate or constitute a breach of any of the provisions hereof and Tenant will attorn to such mortgagee or holder, or to any purchaser of the Property or Building, at any foreclosure sale or sale in lieu of foreclosure, on the performance of the Terms and on all other terms and conditions herein set forth. If Tenant by entering into this Lease, covenants and agrees that (a) upon the written direction of Lender it shall pay all rents arising under this Lease as directed by such Lender; and (b) in the event such Lender enforces its rights under the mortgage or deed of trust due to a default by Landlord, and this Lease is not extinguished by a foreclosure of the mortgage or deed of trust, Tenant will, upon request of any person succeeding to the interest of Landlord in the Property ("successor in interest") as the result of said enforcement, automatically attorn to such successor in interest, without any change in terms or other provisions of this Lease; provided, however, that said successor in interest shall not be: (i) liable for any previous act or omission of any prior landlord, including Landlord, under this Lease; (ii) bound by any payment of rent or additional rent for more than one month in advance, except payments in the nature of security, but only to the extent such payments have been delivered to such successor in interest; (iii) bound by any modifications to the Lease (including any agreement providing for early termination or cancellation of the Lease) made without any requisite consent of the Lender or any such successor in interest; (iv) bound by any covenant or obligation of Landlord to perform, undertake or complete any work in the Premises or to prepare it for occupancy; (v) bound by any obligation to make any payment to Tenant or to grant any credits, except for service, repairs, maintenance and restoration provided for under this Lease to be performed by Landlord after the date of Tenant's attornment; (vi) responsible for any funds, including security deposits, owing to Tenant; or (vii) subject to any demands, claims, counterclaims, offsets or defenses which Tenant might have against any prior landlord, including Landlord.

**20. ESTOPPEL CERTIFICATE.** Tenant agrees that from time to time upon not less than ten (10) days' prior request by Landlord or any Lender, Tenant or Tenant's duly authorized representative having knowledge of the following facts shall deliver to Landlord or such Lender a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications that the Lease as modified is in full

force and effect); (B) the dates to which the rent, rent adjustments and other charges have been paid; (C) that neither Landlord nor Tenant is in default under any provision of this Lease, or, if in default, the nature thereof in detail; (D) that there are no offsets or defenses to the payment of Base Rent or any other sums payable under this Lease, or if there are any such offsets or defenses, specifying such in detail; (E) the Term of this Lease; and (F) such other information as may be reasonably requested.

**21. BROKERS.** Tenant represents and warrants to Landlord that neither it nor its officers or agents nor anyone acting on its behalf has dealt with any real estate broker in the negotiation or making of this Lease. Tenant shall indemnify and hold harmless Landlord from the claim or claims of any broker or brokers claiming to have interested Tenant in the Building or Premises.

**22. SECURITY DEPOSIT.** As additional security for the full and prompt performance by Tenant of all of Tenant's obligations hereunder, Tenant shall pay to Landlord's agent upon execution of this Lease the sum of Three Thousand Eight Hundred Fifty Eight and 38/100 Dollars ($3,858.38) which sum may be retained, used or applied by Landlord for the purpose of curing any default or defaults of Tenant under this Lease. Notwithstanding the foregoing, in the event Tenant fails to deliver to Landlord current financial statements within thirty (30) days prior to the commencement of the Term, which are reasonably acceptable to Landlord, or in the event Tenant is late in the payment of rent more than two times in any twelve month period, the security deposit will be increased by an additional two (2) months of Base Rent and will be payable by Tenant immediately upon request from Landlord. If Tenant has not defaulted hereunder or if Landlord has not retained, used or applied this security deposit to any defaults, then this security deposit or any portion thereof not so retained, used or applied by Landlord shall be paid in cash, without interest, to Tenant following the termination of this Lease or any extensions or renewals thereof. If Tenant fails to make the deposit as aforesaid, or if the whole or any part of said security deposit is retained, used or applied for the curing of defaults, Tenant shall immediately deposit with Landlord's agent an amount of cash equal to the amount so used or applied so that Tenant shall at all times have on deposit with Landlord's agent an amount equal to such original deposit as security as aforesaid. At its election, Landlord may apply any rental payments received to satisfy any security deposit deficiency. Landlord shall not be required to keep the security deposit separate from its general funds or pay interest thereon to Tenant. The use, application or retention of the security deposit, or any part thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by law and shall not operate as a limitation upon any recovery to which Landlord may be entitled.

**23. LIMITATION OF LANDLORD'S LIABILITY.** (A) Landlord has appointed Merchandise Mart Properties, Inc. ("MMPI"), as its authorized management and leasing agent for the property. Tenant acknowledges that MMPI will not be acting in a personal capacity, but rather in a representative capacity as the authorized agent for Landlord. Tenant agrees that it shall look only to Landlord, subject to the provisions of Article 23(B), for the performance of Landlord's obligations under this Lease and for the satisfaction of any right of Tenant for the collection of any claim, judgment or other judicial determination (whether at law or in equity) or arbitration award requiring the payment of money, and neither MMPI nor any of its agents, incorporators, shareholders, beneficiaries, trustees, officers, directors, employees, partners, principals (disclosed or undisclosed) or affiliates or any of their respective assets or property shall be subject to any claim, judgment, levy, lien, execution, attachment or other enforcement procedure (whether at law or in equity) for the satisfaction of Tenant's rights and remedies under or with respect to this Lease or under law, or Tenant's use and occupancy of the Premises or any liability or obligation of Landlord to Tenant. The limitation of Landlord's liability under this Lease, including any waiver of subrogation rights, shall apply with equal force and effect to, and as a limitation on and a waiver of any liability of, MMPI.

B.  Tenant agrees to look solely to Landlord's interest in the Property for the enforcement or payment of any judgment, award, order or other remedy under or in connection with this Lease or any related agreement, instrument or document in respect of any matter whatsoever relating to this Lease, the Premises or the Property. No other assets of Landlord (or any assets of any partners, beneficiaries, managers, members, stockholders, officers, employees or agents of Landlord) shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies. No personal liability is assumed by, nor shall at any time be asserted or enforceable against Landlord, its members, any successor owner or their respective successors or assigns or the members, partners, beneficiaries, officers, directors, employees, shareholders or partners thereof, or the agents or employees of any of them on account of this Lease or any covenant, undertaking or agreement of Landlord in this Lease contained.

**24. OFAC LIST.** Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any Legal Requirement.

**25. RIDERS.** All Exhibits and riders attached to this Lease and signed by Landlord and Tenant or expressly referenced in the Lease are made a part hereof and are incorporated herein by reference.

IN TESTIMONY WHEREOF, the parties hereto have caused this instrument to be executed in duplicate as of the day and year first above written.

TENANT:                                          LANDLORD:

ALEF JUDAICA, INC.,                              MERCHANDISE MART L.L.C.,
a California corporation                         a Delaware limited liability company

                                                 By: VORNADO REALTY L.P., its managing member

BY: _____                    By: VORNADO REALTY TRUST, its general partner

ATTEST: _____

FEIN # _95-4451067_____                     By: _____
                                                     Christopher G. Kennedy, President
                                                     Merchandise Mart Properties, Inc.

**CERTIFICATE**
**(If Tenant is a Corporation)**

I, _Lance Benson_ Secretary of _Alef Judaica_, Tenant, hereby certify that the foregoing Lease has been authorized by all necessary corporate action on behalf of Tenant, the officer(s) executing the foregoing Lease on behalf of Tenant was/were duly authorized to act in his/their capacities as _____ and _____ and his/their action(s) are the action of Tenant.

(Corporate Seal)

_____ Secretary

**RIDER**

This Rider attached to and made a part of a Lease dated _April 16_____, 2007, by and between **MERCHANDISE MART L.L.C.**, a Delaware limited liability company, (hereinafter "Landlord") and **ALEF JUDAICA, INC.**, a California corporation (hereinafter "Tenant").

26.    **CANCELLATION OF PRIOR LEASE.** It is mutually understood and agreed that effective May 31, 2007 ("Effective Date") that certain Lease by and between the parties hereto dated January 22, 2002 ("Prior Lease") and covering Room 13-646 ("Prior Premises"), shall be cancelled and terminated and shall have no further force and effect, except that Tenant shall remain liable for any and all obligations due and accruing thereunder up to and including the Effective Date and Tenant shall vacate and surrender the Prior Premises to Landlord in accordance with the Prior Lease.

27.    **ABATEMENT.** In consideration of the covenants and agreements herein contained, and so long as Tenant is not in default under the terms, covenants and agreements contained in this Lease, it is expressly understood and agreed that a portion of the Base Rent for the period beginning June 1, 2007 and ending May 31, 2010, in the amount of Five Hundred Eight and 76/100 Dollars ($508.76) per month, for a total of Eighteen Thousand Three Hundred Fifteen and 51/100 Dollars ($18,315.51) shall abate ("Abatement") and Tenant shall have no liability therefor; provided, however, that in the event this Lease, or Tenant's right of possession, is terminated prior to the regularly scheduled expiration date of the Term due to a default by Tenant, then in such event, in addition to all other rights and remedies available to Landlord hereunder, Tenant agrees to pay to Landlord as additional rent under this Lease an amount equal to the then unamortized amount of the Abatement as of the date of such termination amortized over the Term at 9% interest thereon.

28.    **LANDLORD'S WORK.** Landlord agrees, at its sole cost and expense, to perform the following Scope of Work in the Premises:

a)  Build a demising wall between Room 12-630 and 12-632;
b)  Add electrical if needed;
c)  Patch slat walls to be consistent throughout the space;
d)  Patch and paint the ceiling and walls with one coat of Building standard paint;
e)  Shampoo and vacuum the existing carpet;
f)  Replace any burned out bulbs; and
g)  Provide assistance in moving the packed merchandise and fixtures from the Prior Premises to the Premises.

All work will be performed in accordance with the standards and conditions applicable to construction work in the Building. Any additional construction and decorating is the Tenant's responsibility.

TENANT:

**ALEF JUDAICA, INC.**,
a California corporation

By:_____

ATTEST:_____

LANDLORD:

**MERCHANDISE MART L.L.C.**,
a Delaware limited liability company

By: VORNADO REALTY L.P., its managing member

By: VORNADO REALTY TRUST, its general partner

By: _____
Christopher G. Kennedy, President
Merchandise Mart Properties, Inc.

## EXHIBIT "B"

### CERTAIN RIGHTS RESERVED BY LANDLORD

(A)    To change the Building's name or street address.

(B)    To install, affix and maintain any and all signs on the exterior and interior of the Building.

(C)    To designate and approve, prior to installation, all types of window shades, blinds, drapes, awnings, window ventilators and other similar equipment, and to control all internal lighting that may be visible from the exterior of the Building.

(D)    To exclusively designate, limit, restrict and control any business or service in or to the Building and its tenants.

(E)    To prohibit vending or dispensing machines of any kind in or about the Premises without the prior written permission of Landlord.

(F)    To show the Premises to prospective tenants at reasonable hours and if vacated during the Term to prepare the Premises for re-occupancy.

(G)    To approve the weight, size and location of safes and other heavy equipment and bulky articles in and about the Premises and the Building (so as not to exceed the legal live load), and to require all such items and furniture and similar items to be moved into and out of the Building and Premises only at such times and in such manner as Landlord shall direct in writing. Any damages done to the Building or to other tenants in the Building by taking in or putting out safes, furniture, and other articles or from overloading the floor in any way shall be paid by Tenant. Movements of Tenant's property into or out of the Building and within the Building are entirely at the risk and responsibility of Tenant; Landlord reserves the right to require permits before allowing any such property to be moved into or out of the Building. Landlord reserves the right to regulate the movement of, and to inspect, all property and packages brought into or out of the Building to enforce compliance with the terms of this Lease and to regulate delivery and service of supplies and the usage of loading docks, receiving areas and freight elevators.

(H)    To close the Building after regular working hours and on weekends and holidays established by Landlord from time to time subject, however, to Tenant's right to admittance under such regulations as Landlord may prescribe from time to time, which may include, by way of example but not of limitation, that persons entering or leaving the Building identify themselves to a security officer by registration or otherwise and that said persons establish their right to enter or leave the Building.

(I)    To decorate or to make Improvements, whether structural or otherwise, in and about the Building, the Property and the Premises, or any part thereof, and for such purposes to enter upon the Premises, and, during the continuance of any of said work, to temporarily close doors, entryways, public space and corridors in the Building or the Property and to interrupt or temporarily suspend Building services and facilities, all without abatement of rent or affecting any of Tenant's obligations hereunder, so long as the Premises are reasonably accessible for the use provided under this Lease.

(J)    To change the arrangement, configuration, size or location of entrances, passageways, doors and doorways, corridors, stairs, restrooms and other public service portions of the Building and the Property not contained within the Premises or any part thereof.

(K)    To change the character or use of any part of the Building or the Property.

(L)    To use for itself the roof, the exterior portions of the Premises and such areas within the Premises required for structural columns and their enclosures and the installation of utility lines, building systems and other installations required to service the Building, the Property or tenants or occupants thereof and to maintain and repair same, no rights being hereby conferred upon Tenant, and, unless otherwise specifically provided herein, to exercise for itself all rights to the land and improvements below the floor level of the Premises or the air rights above the Premises and to the land and improvements located on and within the public areas. Neither Tenant nor its employees, invitees, guests and agents shall, without obtaining in each instance the prior written consent of Landlord, which consent shall be conditioned upon such requirements as Landlord deems appropriate, (1) go above or through suspended ceilings, (2) remove any ceiling tiles or affix anything thereto, remove anything therefrom or cut into or alter the same in any way, (3) enter fan rooms or other mechanical spaces, or (4) open doors or remove panels providing access to utility lines, Building systems or other installations required to service tenants.

(M)    To enter the Premises for the purpose of inspecting them for general condition and state of repair or effecting repairs or modifications for the benefit of Landlord, Tenant, or other tenants of the Building. The holder of any mortgage of the Landlord's interest in the Property, its agents or designees shall have the same right of entry for inspection as Landlord.

(N)    Landlord shall have the right to apply payments received from Tenant pursuant to this Lease (regardless of Tenant's designation of such payments) to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord in its sole discretion may elect.

(O)    In order to maintain the integrity of the marketplace, at any time hereafter Landlord may substitute for the Premises other premises in the Building (hereinafter referred to as "the new premises") upon sixty (60) days' prior written notice provided; (1) the new premises shall be equal to or greater to the Premises in area; (2) the new premises shall be comparable to the Premises in Landlord's reasonable judgment and Landlord shall attempt to maintain proximate industry groupings; (3) Landlord shall bear all costs reasonably necessary to physically move Tenant's operations and movable trade fixtures (but not specialized improvements) from the Premises to the new premises, including relocation of existing telephone and computer systems, if any; and (4) the new premises shall be occupied for the balance of the Term under all of the terms, covenants and agreements herein contained, including the payment of rent. In addition, if the Premises contain less than 600 rentable square feet, or if the remaining Term is one year or less at the time the relocation would be effective in lieu of the above, Landlord shall have the right to cancel the Term of the Lease upon sixty (60) days written notice to Tenant.

(P)    Tenant, as an inducement to Landlord to enter into this Lease, has submitted to Landlord prior to the date hereof balance sheets and income statements reflecting Tenant's financial condition ("Financial Statements"). Tenant hereby represents that its financial condition as of the date hereof has not undergone any material, adverse change from the latest Financial Statement submitted to Landlord. Upon Landlord's written request from time to time, but not more than twice per calendar year, Tenant shall promptly submit Tenant's then current Financial Statements and if Tenant is a corporation or partnership, such statements shall indicate the names of the holders of the then current ownership interests in Tenant (unless Tenant is publicly-traded).

### RULES AND REGULATIONS

(A)    No sign, picture, advertisement or notice, typewritten or otherwise, shall be displayed, inscribed, painted or affixed outside or inside the Building, or on or about the Premises except on glass of the doors and windows of the Premises and on the directory board of the Building and then only of such nature, color, size, style and material as shall be first approved by Landlord in writing.

(B)    Tenant shall not install or operate any equipment, machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises, or use or permit to be brought into the Building flammable fluids such as gasoline, kerosene, benzene, or naphtha or use any illumination other than electric lights. All equipment, fixtures, lamps and bulbs shall be compatible with, and not exceed the capacity of, the Building's electrical system. No explosives, firearms, radioactive or toxic or hazardous substances or materials, or other articles deemed extra hazardous to life, limb or property shall be brought into the Building or the Premises.

7

(C)        Tenant shall not make noises, cause disturbances or vibrations, or use or operate any electrical or electronic device or other devices that emit sound or other waves or disturbances, including wireless internet access points and wireless networks or computer devices, or create odors or noxious fumes, any of which may be offensive to other tenants and occupants of the Building, or that would interfere with the operation of any device or equipment or radio or television broadcasting or reception from or within the Building or elsewhere, and shall not place or install any projections, antennae, aerials or similar devices, including but not limited to wireless device and devices, inside or outside of the Premises. Neither Tenant nor any third party contractor, agent, licensee or affiliate of Tenant shall (i) resell internet access or otherwise charge others for internet access without Landlord's prior written approval; and (ii) use internet services for operation as an internet service provider from the Premises, or for any other business enterprise within the Building.

(D)        All janitor work shall be paid for by Tenant. Any persons employed by Tenant to do janitor work or care for the Premises shall be subject to and under the control and direction of the building manager while in the Building and outside the Premises, but not as agent of Landlord. Refuse and rubbish shall be stored and transported in containers acceptable to Landlord and shall be deposited in locations acceptable to Landlord.

(E)        All telegraph, telephone, internet, communication and electric connections, whether using cables or wireless systems, which Tenant may desire shall be first approved by Landlord in writing, before the same are installed, and the location of all wires or wireless systems and the work in connection therewith shall be subject to the direction of Landlord. Landlord reserves the right to designate and control the entity or entities providing telephone or other communication cable installation, repair and maintenance in the Building and to restrict and control access to telephone cabinets. In the event Landlord designates a particular vendor or vendors to provide such cable installation, repair and maintenance for the Building, Tenant agrees to abide by and participate in such program.

(F)        Tenant must list all furniture product and fixtures to be taken from the Building upon a form furnished by Landlord. Such list shall be presented at the office of the Building for approval before acceptance by the security officer or elevator operator.

(G)        Tenant, its customers, invitees, licensees, agents, servants, employees and guests shall not encumber or obstruct sidewalks, entrances, passages, courts, corridors, vestibules, halls, elevators, stairways or other common areas in or about the Building.

(H)        No bicycle, other vehicle, or animal shall be allowed in the showrooms, offices, halls, corridors or other parts of the Building.

(I)        Tenant shall not allow anything to be placed against or near the glass in the partitions between the Premises and the halls or corridors of the Building which shall diminish the light in the halls or corridors.

(J)        Tenant shall not allow anything to be placed on the outer window ledges of the Premises, nor shall anything be thrown by Tenant or its employees out of the windows of the Building. Tenant shall keep all windows closed.

(K)        No additional locks shall be placed upon any doors of the Premises and no locks shall be changed without the prior written consent of Landlord. Upon termination of this Lease, Tenant shall surrender all keys of the Premises and of the Building and give to Landlord the explanation of the combination of all locks on safes or vault doors in the Premises.

(L)        Landlord and its agents shall at all times keep a pass key and be allowed admittance to the Premises to cover any emergency, fire or other casualty that may arise and in other appropriate instances.

(M)        Unless otherwise advised by Landlord, neither Tenant nor its employees shall undertake to regulate the radiator controls or thermostats. Tenant shall report to the office of the Building whenever such thermostats or radiator controls are not working satisfactorily.

(N)        If Tenant desires shades or venetian blinds for outside windows, they must be furnished and installed at the expense of Tenant, and must be of such type, color, material and make as may be prescribed by Landlord.

(O)        Tenant shall not peddle, canvass, solicit or distribute handbills or flyers on or about the Property.

(P)        Tenant shall not sell food of any kind or cook in the Building. Tenant may serve complimentary foods to its guests provided that it shall first comply with all applicable Legal Requirements.

(Q)        Tenant shall comply with all safety, fire protection, conservation and disposal/recycling procedures and requirements established by Landlord or any governmental authority.

(R)        Tenant shall use neither the name of the Building (except as the address of its business) nor pictures of the Building in advertising or other publicity or for any other purpose without Landlord's prior written consent.

(S)        In the event Tenant designates non-smoking areas in the Premises, Tenant shall also designate sufficient smoking areas within the Premises for its employees, and in no event shall Tenant allow its employees to use the public areas of the Building as smoking areas.

(T)        Tenant shall not by itself or through any officer, salesman, employee, agent, advertisement or otherwise solicit business in the vestibules, entrances, elevator lobbies, corridors, hallways, elevators, restrooms, or other common areas of the Building.

(U)        Furniture, boxes, merchandise or other bulky articles shall be transported within the Building only upon or by vehicles equipped with rubber tires and shall be carried only in a freight elevator, at such times as the building manager shall fix.

(V)        Tenant will not use or permit upon the Premises anything that will invalidate any policies of insurance now or hereafter carried on the Building or that will increase the rate of insurance on the Premises or on the Building.

(W)        Tenant will not (a) use or permit upon the Premises anything that may be dangerous to life or limb; (b) in any manner deface or injure the Building or any part thereof or overload the floors of the Premises; or (c) do anything or permit anything to be done upon the Premises in any way tending to create a nuisance or tending to disturb any other tenant in the Building or the occupants of neighboring property, or tending to injure the reputation of the Building. Tenant shall further not carry on or permit any activities which might: (1) involve the storage, use or disposal of medical or hazardous waste substances or the creation of an environmental hazard; or (2) impair or interfere with (i) the structure of the Building or the operation of Building systems, (ii) the character, reputation or appearance of the Building as a first-class building, (iii) the furnishing of services (including utilities, telephone and communications) to any portion of the Building, or (iv) the enjoyment by any other occupants of the Building or the benefits of such occupancy (for example, free of noise, odors or vibration emanating from the Premises). The Premises shall not be used for the purposes of any so called "office suites", schools, employment agencies or medical treatment facilities.

(X)        Tenant will not use the Premises for lodging or sleeping purposes.

(Y)        Landlord reserves the right to make such other and further rules and regulations as in Landlord's judgment may from time to time be needed for the safety, care and cleanliness of the Premises and the prudent operation of the Building and for the preservation of good order therein.

(Z)        Tenant shall not allow or permit automated teller machines, or similar cash dispensing devices, to be available in the Premises for public use.