**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ALEF JUDAICA, INC., a California corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>MERCHANDISE MART, L.L.C., a Delaware limited liability company,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 08 CV 3408

Judge Lindberg
Magistrate Judge Brown

**DEFENDANT MERCHANDISE MART, L.L.C.'s ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIM
TO PLAINTIFF ALEF JUDAICA, INC.'s COMPLAINT**

Defendant MERCHANDISE MART, L.L.C. ("The Mart"), by and through its attorneys,

Perkins Coie LLP, answers Plaintiff ALEF JUDAICA, INC.'s ("Alef") Complaint as follows:

**NATURE OF THE CASE**

1.     Plaintiff Alef Judaica, The Mart's tenant for nearly twenty years, brings this action against The Mart for fraudulently inducing it into a new lease and then breaching that new lease. The events that give rise to this Complaint began when The Mart approached Alef Judaica about moving its showroom from its existing location on the 13th floor of the Merchandise Mart to a space on the 12th floor. After Alef Judaica initially declined, The Mart then lowered the rent for the new space, resulting in an offer of more space, in a more attractive location, and for less money than Alef Judaica was then paying in rent. Given this extremely attractive offer, Alef Judaica agreed and the parties entered into a new, three-year lease in April 2007 for a showroom on the Merchandise Mart's 12th floor.

    **ANSWER:**     The Mart admits that Plaintiff purports to bring a claim for fraudulent

inducement and breach of a lease agreement. The Mart admits that it engaged in negotiations

with Plaintiff regarding moving from a showroom on the 13th floor to a showroom on the 12th

floor, and that in April 2007, The Mart and Alef ultimately entered into a lease with a three year

term for a showroom on The Mart's 12th floor. The Mart admits that the 12th floor showroom

leased to Alef was larger in area than the 13th floor showroom leased to Alef. The Mart denies the remaining allegations and conclusions of Paragraph 1.

2.     A few months later, The Mart's reasons for clearing Alef Judaica and others off of the 13th floor became clear: The Mart was clearing tenants from the 13th floor to make room for other, apparently more desirable, tenants that would soon need to move there from the 12th floor. The Mart showed this by, in July 2007, informing Alef Judaica that The Mart had decided to use the 12th floor for a different purpose, meaning Alef Judaica would have to leave its new showroom and become a temporary tenant. When it lured Alef Judaica into moving out of its 13th floor showroom by suggesting it move to a new location on the 12th floor and agreeing to a three-year lease for that location, The Mart did not tell Alef Judaica about its plans to use the 12th floor for other purposes.

**ANSWER:**     The Mart denies the allegations and conclusions of Paragraph 2.

3.     Although, Alef Judaica refused to give up its new showroom, The Mart nevertheless required Alef Judaica to vacate its showroom before the end of, and in breach of, the parties' new three-year lease. As a result of The Mart's breach, Alef Judaica lost its showroom and the sales that showroom generated. Alef Judaica now brings this action to recover the over $200,000 in damages it has and will continue to suffer plus punitive damages, attorneys' fees, and costs resulting from The Mart's breach of contract and fraudulent conduct.

**ANSWER:**     The Mart admits that Plaintiff purports to claim damages in an amount exceeding $200,000, plus punitive damages, attorneys' fees and costs. The Mart denies the remaining allegations and conclusions of Paragraph 3.

## PARTIES

4.     Plaintiff Alef Judaica, Inc., a Judaica wholesaler that offers a wide selection of Judaica, Jewish gifts, Jewish books, Jewish ritual items and related items, is a California corporation with its principal place of business at 13310 South Figueroa Street in Los Angeles, California.

**ANSWER:**     The Mart admits that Plaintiff is a Judaica wholesaler that offers a wide selection of Judaica, Jewish gifts, Jewish books, Jewish ritual items and related items, and is a California corporation. The Mart is without sufficient information to admit or deny the remaining allegations of Paragraph 4, and on that basis denies them.

5.      Defendant Merchandise Mart, L.L.C. ("The Mart") is a Delaware limited liability company with offices in the Merchandise Mart. The Merchandise Mart, located at 222 Merchandise Mart Plaza in Chicago, Illinois, houses the world's largest wholesale design center and attracts more than three million visitors a year. The Mart acts as the landlord for retailers, like Alef Judaica, looking to lease space in the Merchandise Mart.

**ANSWER:**      The Mart admits the allegations of the first and second sentences of

Paragraph 5. The Mart affirmatively states that it acts as a mixed-use landlord for both retailers

and wholesalers. The Mart denies the remaining allegations of Paragraph 5.


6.      The Mart's sole member is Vornado Realty LP, a Delaware limited partnership. Vornado Realty LP's sole member, in turn, is the Vornado Realty Trust, a publicly traded Maryland real estate investment trust. Vornado Realty Trust's trustees are Steven Roth, Candace K. Beinecke, Anthony W. Deering, Michael D. Fascitelli, Robert P. Kogod, Michael Lynne, David Mandelbaum, Robert H. Smith, Ronald Targan, Richard R. West, and Russel B. Wight, Jr. On information and belief, none of the Vornado Realty Trust's trustees are citizens of the state of California.

**ANSWER:**      The Mart admits the allegations of Paragraph 6.


## JURISDICTION AND VENUE

7.      Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a), because (1) Alef Judaica is a citizen of California and neither the Defendant, its member, its member's member, nor, upon information and belief, the trustees of its member's member are citizens of California and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:**      The allegations of Paragraph 7 are legal conclusions to which no

response in required. The Mart does not, however, contest that this Court has subject matter

jurisdiction over Plaintiff's claims.


8.      Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred in the Northern District of Illinois, and because the Defendant's offices are within the Northern District of Illinois.

**ANSWER:**      The allegations of Paragraph 8 are legal conclusions to which no

response in required. The Mart does not, however, contest that venue in this Court is proper.

## BACKGROUND FACTS

9.    Prior to the events giving rise to the claims set forth in this Complaint, Alef Judaica maintained a permanent showroom on the 13th floor of the Merchandise Mart for approximately twenty years.

**ANSWER:**    The Mart admits that Alef leased a permanent showroom on the 13th

floor of The Mart from July 1, 1996 through May 31, 2007.  The Mart denies the remaining

allegations and conclusion of Paragraph 9.

10.    From this permanent showroom, Alef Judaica displayed its products during shows put together by The Mart.  The Mart targeted these shows to potential purchasers of design products like those sold by Alef Judaica.  By having a permanent showroom, Alef Judaica had the space necessary to display its entire product line.  Having a permanent showroom also allowed Alef Judaica to avoid having to ship samples of that product line back and forth between Chicago and its main offices in California, thereby avoiding the risks associated with such shipments.

**ANSWER:**    The Mart admits that it produced shows for the sale of gift products,

such as those sold by Alef, and that Alef participated in some of these shows.  The Mart is

without sufficient information to admit or deny the remaining allegations of Paragraph 10, and

on that basis denies them.

11.    Since 2000, Alef Judaica has averaged nearly $100,000 in annual sales from its showroom at The Mart during two shows, The Chicago Market:  Living and Giving, held in January and July or August of each year ("Winter Show" and "Summer Show" respectively).  On average, since 2000, Alef Judaica had sales of $36,746 during the Winter Show and $61,759 during the Summer Show.

**ANSWER:**    The Mart admits that since 2007, it has produced a gift show called

"The Chicago Market: Living and Giving," which was held twice a year, once in January and

once in July.  The Mart is without sufficient information to admit or deny the remaining

allegations of Paragraph 11, and on that basis denies them.

12.    Alef Judaica rented its permanent showroom through a series of lease agreements and amendments.  Prior to the events that gave rise to the claims in this Complaint, Alef

Judaica's lease with The Mart for the showroom on the 13th floor was to expire on June 30, 2008.

**ANSWER:**    The Mart admits the allegations of Paragraph 12.

13.    Though satisfied with its 13th floor showroom, Alef Judaica regularly discussed with The Mart's representatives the idea of moving to other locations within The Merchandise Mart. Indeed, in the Second Lease Amendment that ran through June 30, 2008, the parties included a provision granting Alef Judaica the option to relocate during the term of that lease.

**ANSWER:**    The Mart admits that while a tenant on the 13th floor, Alef expressed to The Mart's representatives its desire to relocate to a showroom on the 12th floor many times. The Mart further admits that the Second Lease Amendment executed for Alef's 13th floor showroom terminated on June 30, 2008 and contained a provision allowing Alef to relocate during the term of the lease. The Mart is without sufficient information to admit or deny Alef's allegation that it was "satisfied with its 13th floor showroom," and on that basis denies it. The Mart denies the remaining allegations of Paragraph 13.

### A.    The Mart Offers Alef Judaica The Opportunity To Move Off Of The 13th Floor.

14.    In November 2006, with well over a year and a half remaining on Alef Judaica's existing lease, the Mart's leasing manager, Marion Jarocki, approached Alef Judaica and offered it the opportunity to move its showroom to a space on the 12th floor. In making this offer, The Mart was not acting pursuant to the relocation provision of the current lease, but rather simply proposing a new lease for the new space.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 14.

15.    Acting through Lance Arenson, its President, Alef Judaica initially declined The Mart's offer because it did not want to pay more than it was currently paying, even if the space was larger and in a more attractive location than its current space.

**ANSWER:**    The Mart admits that Alef expressed concern about paying a higher rental rate for a 12th floor showroom than it was paying for the 13th floor showroom. The Mart denies the remaining allegations of Paragraph 15.

16.    In response, The Mart lowered the rent it sought for the new space so that the rent for that new space would actually be less than what Alef Judaica was already paying for its existing showroom.

**ANSWER:**    The Mart admits that it negotiated with Alef with regard to the rent on a 12th floor showroom, and that the parties ultimately agreed to a conditional abatement of a portion of the base rent charged for the 12th floor showroom. The Mart denies the remaining allegations of Paragraph 16.

17.    At no time during its discussions with Alef Judaica did The Mart inform, or even mention, that it was considering using the 12th floor for other purposes that would or could require Alef Judaica to vacate the new showroom at any time prior to the end of the three-year Lease being proposed by The Mart.

**ANSWER:**    The Mart denies the allegations of, and facts assumed in, Paragraph 17.

18.    Given that it was now being offered more space for less money, in March 2007, Alef Judaica accepted The Mart's new offer for a new three-year lease for a showroom on the 12th floor.

**ANSWER:**    The Mart admits that the parties agreed on lease terms for a 12th floor showroom. The Mart denies that it offered Alef "more space for less money." The Mart is without sufficient information to admit or deny the remaining allegations of Paragraph 18, and on that basis denies them.

### B.    The Parties Agree To Enter Into A New Lease For A Showroom On The 12th Floor And Alef Judaica Moves Into Its New Showroom.

19.    As a result, on April 16, 2007, the parties entered into a new lease drafted by The Mart. Under its terms, the new lease cancelled the parties' existing lease for Alef Judaica's 13th floor showroom and created a new three-year lease that was to run through May 31, 2010 for a 12th floor showroom. A copy of that new lease is attached as Exhibit 1 and the new lease is referred to here as "the Lease."

**ANSWER:**    The Mart admits that the parties executed a lease for a 12th floor showroom on April 16, 2007. The Mart further admits that the lease for the 12th floor

showroom cancelled and terminated the prior lease for the 13th floor showroom, but provided

that Alef remained liable for all obligations due under the lease for the 13th floor showroom

through May 31, 2007, and that the 12th floor lease's term was to expire on May 31, 2010. The

Mart admits that the lease for the 12th floor showroom is attached to the Complaint as Exhibit 1.

The Mart denies the remaining allegations of Paragraph 19.

20.    The Lease included as Exhibit B "Certain Rights Reserved By Landlord." In Section O of Exhibit B to the Lease, The Mart reserved to itself the right to move Alef Judaica to another showroom to "maintain the integrity of the marketplace." To do so, The Mart had to provide Alef Judaica with at least sixty days written notice and then meet four conditions by: (1) providing a new space as big or bigger than Alef Judaica's current space, (2) providing a new space comparable to Alef Judaica's current space, (3) bearing the costs of moving Alef Judaica into the new space, and (4) allowing Alef Judaica to occupy that new space for the remainder of the Lease.

**ANSWER:**    The Mart admits that the Lease contains Exhibit B, and that Exhibit B

contains Section O, but denies Alef's purported summary of its terms. The Mart denies the

remaining allegations of Paragraph 20.

21.    By proposing a three-year lease with a term providing for the conditions and terms under which Alef Judaica's showroom might be moved within the Merchandise Mart, The Mart represented to Alef Judaica that it would be able to have a showroom in the Merchandise Mart throughout the three-year term of the Lease.

**ANSWER:**    The Mart denies the allegations of Paragraph 21.

22.    Shortly after entering into the new lease, Alef Judaica moved its showroom to the 12th floor of The Merchandise Mart. The first show that Alef Judaica did from that new location was the 2007 Summer Show.

**ANSWER:**    The Mart admits the allegations of Paragraph 22.

**C.    The Mart Informs Alef Judaica That The 12th floor Is To Be Used For Another Purpose And Requires Alef Judaica To Vacate Its New Showroom.**

23.    In July 2007, despite Alef Judaica having just entered into a new lease and moved into its new showroom at The Mart's urging, Mark Furlet, The Mart's Director of Leasing, approached Alef Judaica during [sic] 2007 Summer Show and informed Alef Judaica that The

Mart had decided to use the 12th floor for other purposes. As a result, Furlet informed Alef Judaica that all of the showrooms on the floor, including Alef Judaica's new showroom, would have to be vacated. While some tenants were given the option to move into vacant spaces on the 13th floor, The Mart told Alef Judaica it would not be able to move back to the 13th floor and instead would have to become a temporary tenant.

**ANSWER:** The Mart admits that in July 2007 The Mart's Director of Leasing, Mark Furlet, told Alef's representative that The Mart was redeveloping the 12th floor, and that as a result, the 12th floor tenants were being moved. The Mart admits that it entered into agreements with some 12th floor tenants to move to showrooms on the 13th floor and that it did not offer this option to Alef, and that The Mart offered to move Alef to a temporary space. The Mart denies the remaining allegations of Paragraph 23.

24.    As a temporary tenant, Alef Judaica would not have a showroom at the Merchandise Mart and instead would have to rent space on a show-by-show basis. Without a showroom, Alef Judaica would not be able to display its entire product line, both because of the decreased size of a temporary space and the added costs and risks associated with shipping its products back and forth between the Merchandise Mart and Alef Judaica's California headquarters.

**ANSWER:** The Mart admits the allegations in the first sentence of Paragraph 24. The Mart is without sufficient information to admit or deny the remaining allegations of Paragraph 24, and on that basis denies them.

25.    Responding to The Mart's request, Mr. Arenson told The Mart's Furlet that Alef Judaica was not interested in becoming a temporary tenant and instead wished to maintain a permanent showroom for the remaining two-plus years of the Lease.

**ANSWER:** The Mart admits that Arenson initially told Furlet that Alef preferred to remain in a permanent showroom instead of moving to a temporary space. The Mart denies the remaining allegations of Paragraph 25.

26.    Later during the 2007 Summer Show Furlet again told Alef Judaica that The Mart wanted it to become a temporary tenant. Once again, Alef Judaica rejected the idea. In response

to this second rejection, Furlet told Alef Judaica that if Alef Judaica did not want to move, The Mart would simply build around its showroom and leave it as an island on the 12th floor.

**ANSWER:**         The Mart admits that Furlet had multiple conversations with Arenson in the summer of 2007 regarding moving Alef from the 12th floor, Alef's delinquency in rent payments to The Mart and various other subjects. Further answering, The Mart admits that Arenson told Furlet that Alef did not want to move to a temporary space. The Mart denies the remaining allegations of Paragraph 26.

27.    With The Mart insisting on Alef Judaica leaving the showroom that The Mart had convinced Alef Judaica to move to and Alef Judaica wishing to live by the terms of its three-year lease for that showroom, the Summer Show ended with the parties agreeing to disagree as to what would happen regarding the showroom. Following the show, Alef Judaica confirmed its position by emailing Furlet to reiterate its desire to remain in a permanent showroom for the term of its lease.

**ANSWER:**         The Mart states that the allegation in the last sentence of Paragraph 27 is too vague to determine which document Alef is referring to, and The Mart is therefore without sufficient information to admit or deny the last sentence of Paragraph 27, and on that basis denies it. The Mart denies the remaining allegations and conclusions of Paragraph 27.

28.    At no time during the 2007 Summer Show, nor at any other time in the months that followed, did The Mart provide Alef Judaica with written notice of its intention to terminate the Lease, as required by the terms of the Lease that The Mart drafted.

**ANSWER:**         The Mart denies the allegations of Paragraph 28.

29.    The Mart's insistence that it move out of its new showroom and become a temporary tenant meant Alef Judaica could not know whether it would be able to use its new showroom for the 2008 Winter Show-the next event for which it would need a showroom. Accordingly, in response to The Mart's announced intention to breach the Lease and to minimize any damages that would result from such a breach, Alef Judaica ceased paying The Mart rent following the 2007 Summer Show.

**ANSWER:**         The Mart admits that Alef was in default of its lease obligations throughout the term of the Lease in that it failed to pay any rent due under the Lease for the 12th

floor showroom. The Mart denies that it announced any intention to breach Alef's lease and further denies the remaining allegations and conclusions of Paragraph 29.

30.     Despite The Mart's insistence that Alef Judaica move out of its new showroom, Alef Judaica did not hear anything further from The Mart in the months that followed the 2007 Summer Show. During this time, Alef Judaica did, however, hear about other tenants who were being forced out of showrooms near Alef Judaica's. Some of these tenants were offered the opportunity to move to the 13th Floor, while others were not. Still other tenants, especially those with only a few months left on their leases and including tenants looking to get out of their leases, were told they would be held to the terms of their leases unless they bought out the lease. Through these inconsistent policies, The Mart sought to maximize its revenue without regard to the legal rights of its tenants, even going so far as to take conflicting positions as to the enforcement of its lease with those tenants.

**ANSWER:**     The Mart is without sufficient information to admit or deny Alef's allegations as to what it heard "about other tenants," and on that basis denies them. The Mart denies the remaining allegations of Paragraph 30.

### D.     The Mart Refuses To Allow Alef Judaica To Participate In The 2008 Winter Show Unless It Abandons Its Showroom.

31.     As the end of 2007 approached, both The Mart and Alef Judaica began planning for the 2008 Winter Show. At this time, The Mart informed Alef Judaica that unless Alef Judaica agreed to abandon its 12th floor showroom — its valid three-year lease notwithstanding — Alef Judaica would not be allowed to participate in the 2008 Winter Show, either as a permanent or temporary tenant.

**ANSWER:**     The Mart admits that by the end of 2007, it was engaged in planning for the 2008 Winter Show. The Mart is without sufficient information to admit or deny Plaintiff's allegation as to its own planning for the 2008 Winter Show. The Mart denies the remaining allegations of Paragraph 31.

32.     When The Mart's latest threat did not cause Alef Judaica to agree to the unlawful termination of its lease, Cary Schiff, an attorney representing The Mart, contacted Alef Judaica's Lance Arenson to inquire what, if anything, he could do to resolve the situation. Once more, Alef Judaica informed The Mart — this time through its attorney, Mr. Schiff — that it did not want to be a temporary tenant and would not agree to the termination of its lease.

**ANSWER:**       The Mart admits that attorney Cary Schiff represented The Mart in a lawsuit filed against Alef based upon its default of its lease obligations, and that Schiff negotiated with Alef on The Mart's behalf.  The Mart further admits that Alef told Schiff that it did not want to move to a temporary space.  The Mart denies the remaining allegations of Paragraph 32.

33.      In response, Mr. Schiff attempted to find a solution that would satisfy both sides. He could not, though, locate another permanent showroom for Alef Judaica.  As a result, around November 21, 2007, Alef Judaica reluctantly agreed that it would be temporary tenant for the 2008 Winter Show.  In exchange for Alef Judaica's agreement, The Mart, through Mr. Schiff, agreed that it would continue seeking a permanent showroom and granted Alef Judaica a right of first refusal on appropriate vacant showrooms.

**ANSWER:**       The Mart admits that on November 21, 2007, Alef agreed to become a temporary tenant.  The Mart further admits that it agreed to put Alef first on the waiting list for a permanent space of an appropriate size.    The Mart denies the remaining allegations and conclusions of Paragraph 33.

34.      Mr. Schiff was to draft an agreement reflecting the parties' agreement.  In the weeks that followed, however, Mr. Schiff failed to provide a draft that reflected the terms actually agreed to by the parties.  Instead, The Mart, through Mr. Schiff, presented multiple drafts containing material terms that differed from those agreed to by the parties.  Accordingly, Alef Judaica rejected each draft and no written agreement was ever finalized.

**ANSWER:**       The Mart admits that Alef refused to sign a document memorializing the parties' agreement.  The Mart denies the remaining allegations of Paragraph 34.

35.      Nonetheless, in early December 2007 and as the parties were exchanging drafts of the proposed written agreement, Alef Judaica informed The Mart that, as The Mart required, it would be moving its materials out of its showroom on the 12th floor.

**ANSWER:**       The Mart admits that Alef informed The Mart in December 2007 that it was moving its materials out of the 12th floor showroom.  The Mart denies the remaining allegations of Paragraph 35.

36.    On December 18, 2007, Alef Judaica's Lance Arenson wrote to The Mart's representatives, including Mr. Schiff, informing them that, as planned, an Alef Judaica employee was traveling to Chicago to pack up the showroom. In response, Mr. Schiff threatened that The Mart would nonetheless seek judgment and a possession order against Alef Judaica. Responding to its own lawyer's threat, The Mart, through Cheryl Longstreet, wrote a few minutes later to say that, assuming Alef Judaica could again confirm that it had already begun moving out of its space, The Mart could hold off on seeking a judgment. Minutes after that, Mr. Arenson confirmed that Alef Judaica had indeed begun moving out and The Mart did not follow through on its threat.

**ANSWER:**    The Mart admits that on December 18, 2007, Arenson e-mailed The

Mart's representatives, including Schiff, and told them that Alef would start moving out of its

12th floor showroom that day. The Mart admits further admits that Schiff communicated to Alef

on the same day that he was pursuing an order of judgment on the possession and collection suit

filed against Alef due to Alef defaulting on its lease. The Mart further admits that Longstreet

told Alef that The Mart would seek a continuance on the judgment of possession and collection if

Alef could confirm that it had begun moving out of its space as of December 18, 2007, and that

after Alef so confirmed, that The Mart did seek such a continuance. The Mart denies the

remaining allegations of Paragraph 36.

37.    As of December 20, 2007, Alef Judaica had moved out of its showroom in The Mart and turned the keys to the space in to The Mart's Mark Furlet.

**ANSWER:**    The Mart admits the allegations in Paragraph 37.

38.    Even after Alef Judaica moved out of its showroom, The Mart continued to change terms of the parties' agreement regarding the termination of the lease. In particular, The Mart refused to include the agreed-upon right of first refusal on a new showroom for a period of time sufficient to assure Alef Judaica that it would actually be able to get a new showroom at The Mart.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 38.

39.    By January 22, 2008, the parties were still in negotiations regarding the written agreement. At that time, The Mart, again acting through its attorney, imposed a deadline for those negotiations by insisting that Alef Judaica accede to The Mart's terms for the written

agreement and sign their version of it by the end of the 2008 Winter Show. When Alef Judaica did not simply agree to The Mart's terms, The Mart set a new deadline of February 1, 2008. Once more, Alef Judaica refused to simply give in.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 39.

40.    As a result, the parties never executed a written agreement to terminate the lease for Alef Judaica's 12th floor showroom at The Merchandise Mart. Nonetheless, through threats and other means, The Mart effectively terminated the lease during the 2007 Summer Show, resulting in Alef Judaica moving out of the showroom on December 20, 2007.

**ANSWER:**    The Mart admits that Alef refused to sign a document memorializing

the parties' agreement. The Mart denies the remaining allegations and conclusions of Paragraph

40.

### E.    Alef Judaica Participates In The 2008 Winter Show As A Temporary Tenant.

41.    Alef Judaica participated in the 2008 Winter Show as a temporary tenant with approximately 200 square feet of space in which to show its products. At this show, Alef Judaica's sales dropped precipitously from prior years, as Alef Judaica failing to make even $2,000 in sales.

**ANSWER:**    The Mart admits that Alef participated in the 2008 Winter Show while

occupying temporary showroom of approximately 200 square feet. The Mart is without

sufficient information to admit or deny the remaining allegations of Paragraph 41, and on that

basis denies them.

### COUNT I — FRAUDULENT INDUCEMENT

42.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

**ANSWER:**    The Mart incorporates its answers to Paragraphs 1 through 41 above as

its answer to Paragraph 42.

43.    To convince Alef Judaica to agree to move its showroom from the 13th floor of The Merchandise Mart, the Mart made material misrepresentations and omissions to Alef Judaica that caused Alef Judaica to agree to the new Lease and move its showroom.

Specifically, by suggesting that Alef Judaica move its showroom to the 12th floor and enter into the new Lease, The Mart misrepresented to Alef Judaica that Alef Judaica would be able to use its new showroom on the 12th floor throughout the three-year term of that lease.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 43.

44.    At the time The Mart sought to have Alef Judaica move its showroom, The Mart knew that it planned to use the 12th floor for other purposes-purposes which would prevent Alef Judaica from using its new showroom throughout the three-year term of the new Lease. By failing to inform Alef Judaica of The Mart's plans to use the 12th floor for other purposes prior to the end of the Lease, The Mart misrepresented its intentions to Alef Judaica.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 44.

45.    In making these misrepresentations and omissions, The Mart intended for Alef Judaica to rely on them and, in agreeing to move and enter into the Lease, Alef Judaica did rely on them without knowing that they were false.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 45.

46.    The Mart made the misrepresentations and omissions willfully and maliciously, disregarding Alef Judaica's interests and rights by attempting to empty the 13th Floor of the Merchandise Mart to make room for tenants The Mart would soon choose to move from the 12th floor.

**ANSWER:**        The Mart denies the allegations and conclusion of Paragraph 46.

47.    By fraudulently inducing Alef Judaica into entering into the Lease and then implementing its plan to use the 12th floor for different purposes, The Mart caused Alef Judaica to lose its showroom. As a result of The Mart's actions, Alef Judaica suffered damages in excess of $200,000.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 47.

## COUNT II — CONSUMER FRAUD

48.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

**ANSWER:**        The Mart incorporates its answers to Paragraphs 1 through 41 above as its answer to Paragraph 48.

49.    The Mart deceived Alef Judaica into agreeing to move its showroom from the 13th floor of The Merchandise Mart by representing to Alef Judaica that it would be able to use its new showroom throughout the three-year term of that lease despite The Mart knowing that it planned to use that floor for other purposes prior to the end of the Lease.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 49.

50.    The Mart intended for Alef Judaica to rely on The Mart's deception and, in agreeing to move its showroom and enter into the Lease, Alef Judaica relied on that deception.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 50.

51.    Because The Mart's deceptions related to the Lease between it and Alef Judaica, The Mart's deceptions occurred in the conduct of commerce.

**ANSWER:**    Paragraph 51 is a legal conclusion to which no response is required.

To the extent a response is required, The Mart denies the allegations of Paragraph 51.

52.    The Mart deceived Alef Judaica willfully and maliciously, disregarding Alef Judaica's interests and rights by attempting to empty the 13th Floor of the Merchandise Mart to make room for tenants The Mart would soon choose to move from the 12th floor.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 52.

53.    As a result of The Mart's deception, Alef Judaica entered into the new Lease and lost its showroom when The Mart implemented its plan to use the 12th floor for different purposes. The Mart's actions resulted in Alef Judaica suffering damages in excess of $200,000.

**ANSWER:**    The Mart denies the allegations and conclusions of Paragraph 53.

## COUNT III — BREACH OF CONTRACT

54.    Alef Judaica incorporates paragraphs 1 through 41 above as though fully restated herein.

**ANSWER:**    The Mart incorporates its answers to Paragraphs 1 through 41 above as its answer to Paragraph 54.

55.    Alef Judaica and The Mart entered into the Lease, a valid lease agreement, on April 16, 2007.

**ANSWER:**        The Mart admits the allegations of Paragraph 55.

56.        Beginning in July 2007 — only months after Alef Judaica moved into its new showroom and with nearly three years remaining on the Lease — The Mart announced to Alef Judaica its intention to breach the Lease by requiring Alef Judaica to move out of its new showroom.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 56.

57.        From July 2007 until December 20, 2007, The Mart demanded that Alef Judaica vacate the showroom that The Mart had convinced it move into earlier that year.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 57.

58.        Despite having the right under the lease to move Alef Judaica to other, similar space in The Merchandise Mart, The Mart never invoked its right under the Lease to move Alef Judaica into another space. Similarly, The Mart never provided Alef Judaica with proper written notice that the Lease was being terminated. Instead, in violation of the terms of the Lease, it simply demanded that Alef Judaica move out of its permanent showroom and become a temporary tenant.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 58.

59.        Alef Judaica performed all of its obligations under the Lease prior to The Mart's announcement of its intent to breach the Lease.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 59.

60.        As a result of The Mart's breaches of the parties' Lease, Alef Judaica was forced out of its permanent showroom and has suffered and will continue to suffer damages as a result. The Mart's breach of the Lease denied Alef Judaica the use of its showroom during five of the six shows scheduled to occur during the term of that lease, resulting in the loss of sales of over $200,000.

**ANSWER:**        The Mart denies the allegations and conclusions of Paragraph 60.

## PRAYER FOR RELIEF

WHEREFORE, Defendant requests that this Court find in its favor and against Plaintiff and award Defendant:

(a) its attorneys' fees incurred in defending this litigation;

(b) its costs incurred in defending this litigation; and

(c) any other such relief as the Court may deem appropriate.

## DEFENSES AND AFFIRMATIVE DEFENSES

The Mart further responds to Plaintiff's Complaint by alleging the following defenses and affirmative defenses:

1. Plaintiff's damages, if any, were not caused by The Mart.

2. Plaintiff has failed to mitigate its damages.

3. Plaintiff's claims are barred by the doctrines of waiver and estoppel. Plaintiff explicitly assented, by its words and actions, to an agreement settling the dispute between the parties as to Plaintiff's move from the 12th floor. As part of that agreement, Plaintiff intentionally and knowingly relinquished its right to contest the move, and in fact consented to the move per the terms the parties agreed to. The Mart relied, to its detriment, on Plaintiff's assent, ceasing its legal efforts to collect unpaid rent from Plaintiff and giving Plaintiff numerous additional concessions, such as the right of first refusal on a new showroom and a discounted rate on a booth for the January 2008 gift show.

4. Plaintiff's claims and/or the relief it seeks are barred by the doctrine of unclean hands. On November 21, 2007, Plaintiff, through its agent Lance Arenson in an e-mail to The Mart's attorney Cary Schiff, falsely represented its agreement to terms settling the dispute between the parties relating to Plaintiff's move from the 12th floor. Plaintiff falsely represented its agreement to a settlement of the dispute in order to secure, among other concessions, The Mart's agreement to forgive all delinquent rent owed by Plaintiff, both for the 12th floor showroom and for Plaintiff's prior 13th floor showroom, and dismiss its lawsuit against Plaintiff for rent owed, and to obtain a discounted rate on a booth for the January 2008 gift show. On November 28, 2008, Plaintiff further falsely manifested its

agreement to a settlement of the dispute by executing a lease with The Mart for a booth at the January 2008 gift market at a rental rate discounted by 50%, per the terms of the parties' agreement.  In late December 2007, Plaintiff further manifested its agreement to the settlement terms by vacating the 12th floor showroom in accordance with the parties' agreement.  Plaintiff intentionally deceived The Mart into believing that the parties had settled their dispute, causing The Mart to cease pursuing its legal action against Plaintiff for rent owed and to give Plaintiff additional concessions.

5.  Plaintiff failed to perform its obligations under the agreements with Defendant.

6.  Plaintiff's actions terminated the Lease and all obligations of The Mart thereunder.

## COUNTERCLAIM

### COUNT I: (Breach of Contract-12th Floor Lease)

Defendant/Counter-Plaintiff Merchandise Mart, L.L.C. ("The Mart"), by and through its attorneys Perkins Coie, L.L.P., complains of Plaintiff/Counter-Defendant Alef Judaica ("Alef") as follows:

1. The lease executed April 16, 2007 by The Mart and Alef, attached as Exhibit 1 to Plaintiff's Complaint (the "Lease"), requires Alef to pay an annual base rent of $23,150.24 during the three-year period 6/1/07-5/31/10, in monthly installments of $1,929.19. Lease at ¶ 3. The Lease requires that each monthly installment be paid by the first day of each calendar month. *Id.*

2. The Lease also required Alef to fulfill its obligations, including the payment of rent, under the prior lease for the 13th floor showroom through May 31, 2007. *Id.* at Rider, ¶ 26.

3. The Lease further provides that if Alef defaults on paying its rent, and does not cure within ten (10) days after written notice from The Mart, The Mart may treat the default as a breach of the Lease and may terminate the Lease without any further action. *Id.* at ¶ 9. Additionally, The Mart is entitled to recover as damages the value of the rent owed under the Lease for the balance of the three-year term. *Id.* The Lease also provides that Alef shall pay all attorneys' fees and expenses incurred by The Mart in enforcing any of Alef's obligations under the Lease, *id.*, and that Alef must pay double the stated base rent during the time it retains possession of the premises after the termination of the Lease. *Id.* at 11.

4. Alef breached the Lease by refusing to pay any rent installments due under the Lease for the 12th floor showroom, and by failing to timely pay rent owed through May 31, 2007

for the 13th floor showroom. In September 2007, The Mart served Alef with 10-day notice of default and Alef failed to cure. Thereafter, the Lease was terminated by The Mart.

5. Alef owes as damages the balance of rent owed under the Lease for the full three-year term, hold-over rent in an amount double the base rent for the time Alef remained in the 12th floor showroom subsequent to the termination of the Lease, shipping costs for Alef's merchandise, and The Mart's attorneys' fees and costs in bringing this counterclaim and in defending against Alef's Complaint. The Mart's damages total at least $ 70,000, plus attorneys' fees and costs.

WHEREFORE, The Mart requests that this Court find in its favor and against Alef and award The Mart its damages, including but not limited to the amounts owed under the Lease, attorneys' fees and costs incurred in bringing this Counterclaim and defending against Alef's Complaint, and other such relief as the Court may deem appropriate.

### COUNT II: (Breach of Contract-Settlement Agreement)

6. The parties entered into an agreement settling the dispute regarding Plaintiff's move from the 12th floor showroom, the terms of which are memorialized in the "Agreement of Termination and Release" (the "Agreement"). Agreement attached hereto as the Exhibit.

7. As set forth in the Agreement, Plaintiff agreed to: (1) vacate the 12th floor showroom; and (2) release and discharge The Mart from all liability, claims and damages arising out of or in connection with Plaintiff's occupancy of the 12th floor showroom.

8. The Mart agreed to: (1) forgive all of Plaintiff's rent arrearages; (2) dismiss its lawsuit against Plaintiff; (3) give Plaintiff a 50% discount on a temporary booth for an upcoming gift show; (4) give Plaintiff the right of first refusal for a new showroom of an

appropriate size, at the same rental rate as the rate in the Lease; and (5) store Plaintiff's merchandise for a specified period of time.

9.  The Mart has performed all of its obligations under the Agreement.

10. Plaintiff has breached the Agreement by bringing this action against The Mart.

11. As a result of Plaintiff's breach, The Mart has incurred damages including legal fees and costs, which continue to accrue as this action proceeds.

WHEREFORE, The Mart requests that this Court find in its favor and against Alef and award The Mart its damages, including but not limited to the attorneys' fees and costs incurred in bringing this Counterclaim and defending against Alef's Complaint, and other such relief as the Court may deem appropriate.

## COUNT III: (Fraud)

12. The Mart incorporates Paragraphs 1-13 of its Counterclaim as fully set forth herein as Paragraph 14.

13. In November and December of 2007, Plaintiff falsely represented to The Mart that it agreed to a settlement of the dispute regarding Plaintiff's move from the 12th floor showroom in order to induce The Mart to forgive Plaintiff's delinquent rent and to grant it additional concessions.

14. Plaintiff knew that its representation was false.

15. Based on Plaintiff's words and actions, The Mart reasonably believed that Plaintiff's agreement to terms settling the dispute was genuine and had no knowledge of its falsity. In reliance on Plaintiff's false representation, The Mart ceased its efforts to collect unpaid rent from Plaintiff and gave Plaintiff additional concessions, thereby incurring damages.

WHEREFORE, The Mart requests that this Court find in its favor and against Alef and award The Mart its damages, including but not limited to the amounts owed under the Lease, attorneys' fees and costs incurred in bringing this Counterclaim and defending against Alef's Complaint, and other such relief as the Court may deem appropriate.

Dated:  August 4, 2008

MERCHANDISE MART, L.L.C.

By:_____/s/ Amanda E. Adrian_____
One of Its Attorneys

Christopher B. Wilson
Amanda E. Adrian
PERKINS COIE LLP
131 S. Dearborn Street, Suite 1700
Chicago, IL  60603-5559
Tel:  (312) 324-8400
Fax:  (312) 324-9400

## CERTIFICATE OF SERVICE

I, Amanda E. Adrian, certify that on August 4, 2008, I caused a true and complete copy of the

**DEFENDANT MERCHANDISE MART, L.L.C.'s ANSWER, AFFIRMATIVE**

**DEFENSES AND COUNTERCLAIM TO PLAINTIFF ALEF JUDAICA, INC.'s**

**COMPLAINT** to be served by CM/ECF upon:

Max A. Stein
Reed Smith LLP
10 S. Wacker Dr.
Chicago, Illinois 60606


                                                /s/ Amanda E. Adrian

# EXHIBIT

## AGREEMENT OF TERMINATION AND RELEASE

This instrument ("Agreement") made as of this ____ day of _____, 2007, by and between **MERCHANDISE MART L.L.C.,** a Delaware limited liability company, having an office c/o Merchandise Mart Properties, Inc., 222 Merchandise Mart Plaza, Suite 470, Chicago, Illinois 60654 (hereinafter "Landlord") and **ALEF JUDAICA, INC.,** a corporation organized and existing under the laws of the State of California (hereinafter "Tenant").

WITNESSETH:

A. WHEREAS, by an Instrument dated April 16, 2007 (hereinafter "Lease") Landlord demised and leased to Tenant certain space commonly known as Room 12-630 on the twelfth floor in the Building known as The Merchandise Mart, Chicago, Illinois, which space is more specifically described in the Lease (hereinafter "Premises").

B.    WHEREAS, Landlord and Tenant desire to terminate the Lease upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, Landlord and Tenant covenant and agree that effective as of the date hereof, the Lease shall be and the same hereby is amended as follows:

1. The Term of the Lease shall be and hereby is terminated effective December 24, 2007 ("Effective Date"), and Landlord releases and discharges Tenant, its agents, employees, successors and assigns from all obligations under the above described Lease which may accrue from and after the Effective Date, subject to the terms hereof. Landlord also agrees to release and discharge Tenant from all past, present and future rental obligations under this Lease.

2. Tenant covenants and agrees that: (a) Tenant shall continue to operate the Premises in a professional and satisfactory manner through the Effective Date under the terms of the Lease; and (b) Tenant shall vacate and surrender the Premises in accordance with the Lease on or before the Effective Date. Tenant further agrees that no order of court or legal process shall be required to recover the Premises if Tenant does not vacate the Premises in accordance with the Lease on the Effective Date, and Landlord may enter the Premises after the Effective Date and dispossess Tenant without any liability or claims made by Tenant.

3. Tenant releases and forever discharges Landlord, its agents, employees, successors and assigns from all liability, claims and damages of any kind which Tenant now has or at any time shall have against Landlord as a result of any matter, cause or thing whatsoever occurring through the Effective Date and arising out of or in connection with Tenant's occupancy of the Premises.

4. Landlord also agrees to the following:  a) provide Tenant with 50% off of an exhibitor booth space for the January 2008 Living and Giving – Chicago Market; b) give Tenant a one-time right of first offer for a new permanent space in the Building consisting of between 400-700 rsf, under the same rental rate of the Lease, dated April 16, 2007, and, c) provide Tenant with storage space through the July 2008 Living and Giving – Chicago Market for the contents of the showroom merchandise.

5. Tenant recognizes and acknowledges that the terms contained herein reflect a significant concession on Landlord's part and in consideration of this concession, Tenant covenants and agrees that the contents of this Agreement shall remain strictly confidential and shall not be disclosed by Tenant to third parties without the prior written consent of Landlord which consent may be granted or withheld at Landlord's sole discretion. Notwithstanding the foregoing, Tenant may, in the ordinary course of its business, disclose this information to its attorneys or accountants provided that they recognize the confidential nature of this information. Tenant shall use efforts at least comparable to its other procedures with respect to maintaining confidential information to protect the information in this Agreement.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Agreement of Termination and Release to be executed the date first above written.

TENANT:                                    LANDLORD:

**ALEF JUDAICA, INC.,**                    **MERCHANDISE MART L.L.C.,**
a California corporation                   a Delaware limited liability company

                                           By:  VORNADO REALTY L.P., its sole member

                                                By: VORNADO REALTY TRUST, its general partner

By: _____
         Authorized Signatory

                                                By:_____
                                                      Christopher G. Kennedy, President
                                                      Merchandise Mart Properties, Inc.